**In re Joseph Vincent DOLATA, Jr., and Marie Louise Dolata, Debtors.**

**Carlota Bohm, Trustee for Joseph V. Dolata and Marie Dolata, Plaintiff,**

**v.**

**Joseph V. Dolata, Jr., Marie L. Dolata, Joseph V. Dolata, III, and Lori Dolata, Defendants.**

**Bankruptcy No. 01–22520–MBM. Adversary No. 02–2133–MBM.**

United States Bankruptcy Court, W.D. Pennsylvania.

Feb. 27, 2004.

David R. Johnson, Thomson, Rhodes & Cowie, P.C., Pittsburgh, PA, for the trustee.

Ronald M. Buick, McKeesport, PA, for Marie L. and Joseph V. Dolata, Jr.

Ronald T. Conway, Pittsburgh, PA, for Lori and Joseph V. Dolata, III.

### MEMORANDUM OPINION

M. BRUCE MCCULLOUGH, Bankruptcy Judge.

Before the Court is the four-count adversary action brought by Carlota Bohm, the instant Chapter 7 Trustee (hereafter "the Trustee"), wherein the Trustee (a) pursues fraudulent conveyance avoidance causes of action pursuant to both 11 U.S.C. § 548 (Count 1) and Pennsylvania fraudulent transfer law (Count 2), (b) requests injunctive relief (Count 3), and (c) objects to the above-captioned debtors' Chapter 7 discharge pursuant to several paragraphs of 11 U.S.C. § 727(a) (Count 4). The Trustee names as defendants in the instant adversary action not only the instant debtors, Joseph Dolata, Jr. and Marie Dolata (hereafter "the Debtors" or "Mr. and/or Mrs. Dolata"), but also the Debtors' son and daughter-in-law, Joseph Dolata, III and Lori Dolata (hereafter "the Nondebtor Defendants" or "the Son" and/or "the Daughter-in-law"), the latter of whom are so named because they are the transferees of much of the property which the Debtors disposed of and which is the subject of the Trustee's fraudulent conveyance causes of action. A trial was held on the matter on August 25, 2003. For the reasons set forth below, the Court (a) avoids as fraudulent conveyances several of the property transfers by the Debtors to the Nondebtor Defendants, which property transfers in particular are spelled out in greater detail below, and correspondingly directs the recovery of such property interests or their value from the Nondebtor Defendants, and (b) denies the Chapter 7 discharges of both of the Debtors.

### STATEMENT OF FACTS

**I. Facts primarily relevant to alleged fraudulent conveyances to the Nondebtor Defendants.**

Set forth below, with relevant detail, related facts, and pertinent allegations by the parties, are those transfers of property from the Debtors to the Nondebtor Defendants that the Trustee attacks on the basis that the same constitute fraudulent conveyances.

#### A. 25 Acres of Land

The Debtors conveyed away approximately twenty-five (25) acres of land by deed dated and executed on July 17, 1998 (hereafter "the 25 Acres"). The deed for such parcel of property (hereafter "the 25 Acres Deed"), a certified copy of which was introduced at trial as Plaintiff's Exhibit 15, indicates that (a) "erected thereon [is] a dwelling known as 1037 Waterman Road," and (b) the consideration given by

the Nondebtor Defendants for such parcel was "Natural Love and Affection."

The Debtors, each of whom was listed as a grantor in the 25 Acres Deed, obtained title to the 25 Acres by way of deeds dated August 8, 1978, and January 17, 1972, which latter deeds listed each of the Debtors as grantees. *See* Son's Ex. D–2 and F–2. The Debtors testified that they intended to, and did, gift the 25 Acres to the Son and the Daughter-in-law by virtue of the 25 Acres Deed. The Son testified that he obtained the 25 Acres by way of a gift from the Debtors. The Debtors and the Son testified that the Son and the Daughter-in-law did not provide any consideration of value in return for the conveyance of the 25 Acres. The Daughter-in-law testified that she thought the Son and herself purchased the 25 Acres for $120,000, which $120,000 they obtained from the Debtors in return for a note and a mortgage; the latter instruments are described below.

### B. *Satisfaction of Mortgage*

The Debtors satisfied a mortgage, which mortgage (a) is dated and was executed on July 17, 1998, and (b) both of the Nondebtor Defendants granted as mortgagors to both of the Debtors as mortgagees (hereafter "the Mortgage"). The Mortgage, a certified copy of which was introduced at trial as Plaintiff's Exhibit 17, indicates that (a) it secures the repayment of a debt of $120,000 owed by the Nondebtor Defendants to the Debtors (hereafter "the $120,000 Debt"), along "with interest," (b) the $120,000 Debt is evidenced by a note dated July 17, 1998, from the Nondebtor Defendants (hereafter "the Note"), which note, according to the Mortgage, provides, *inter alia,* "for monthly payments, with the full debt, if not paid earlier, due and payable on May 1, 2009," (c) the property which is thereby mortgaged is comprised of both the 25 Acres and the Nondebtor

Defendants' personal residence otherwise known as 1035 Waterman Road, and (d) it was recorded on July 29, 1998, with the Allegheny County Recorder of Deeds.

The satisfaction piece which effected the satisfaction of the Mortgage, a certified copy of which was introduced at trial as Plaintiff's Exhibit 18 (hereafter "the Satisfaction Piece"), indicates that (a) it is dated and was executed on October 31, 2000, (b) it was recorded on November 20, 2000, with the Allegheny County Recorder of Deeds, and (c) the $120,000 Debt had, by the date of the Satisfaction Piece, "been fully paid or otherwise discharged."

Mr. Dolata and the Son both testified that the Mortgage was fake—i.e., a sham—from the moment that it was executed. Mr. Dolata and the Son also testified that the $120,000 Debt never really existed. Mr. Dolata and the Son also appear to contend, if they did not precisely testify, that the Note does not now exist and has never existed. Mrs. Dolata testified that (a) she was unaware of the Mortgage's existence through the date upon which it was satisfied, the presence of her signature on the Satisfaction Piece notwithstanding, and (b) Mr. Dolata affixed her signature to the Satisfaction Piece without her authority, an attached acknowledgment by a notary to the effect that Mrs. Dolata appeared before such notary when the same was executed notwithstanding. The Daughter-in-law testified that she believed the Mortgage and the $120,000 Debt were real, and that the $120,000 Debt was incurred for the Nondebtor Defendants' purchase of the 25 Acres.

Mr. Dolata testified that he intended to and did take back the Mortgage as part of the transaction whereby the 25 Acres was conveyed to the Son and the Daughter-in-law. Mr. Dolata also testified, and the Son acknowledged by way of his testimony,

that the purpose of the Mortgage was to provide protection for the Son in the event that he divorced from the Daughter-in-law and, in particular, protection against the loss to the Daughter-in-law of the two parcels of property that constituted collateral by virtue of the Mortgage. Mrs. Dolata testified that, although she was unaware that Mr. Dolata chose to take back the Mortgage as part of the transaction whereby the 25 Acres was conveyed to the Son and the Daughter-in-law, she nevertheless also wished—indeed conveyed to Mr. Dolata her wish—that, as part of such conveyance, a device be put in place to provide the Son with protection regarding the parcels of property that are the subject of the Mortgage in the event that he divorced from the Daughter-in-law. In fact, certain of Mrs. Dolata's testimony indicates that she wished for such device to provide the Son with protection as well against creditors of the Son's business in the event that such business failed. *See* Aug. 25, 2003 Trial Tr., at p. 78, li. 1–6 ("and we never knew whether he was going to be—really, you know, part of his business could go down tomorrow and he wouldn't have a business. That's the type of business he has and I said we have to protect him. I says I want to keep this property and the house."). The testimony of the Debtors, the Son, and certain other of the witnesses that appeared is uniform regarding a disability suffered by the Son that prevents him from being able to read or write; such disability, according to the testimony of the Debtors, constituted the reason for their purpose in providing the Son with the protection as described above. As for the need to provide the Son with protection in particular against the Daughter-in-law, the testimony of both the Debtors and the Nondebtor Defendants is uniform to the effect that the Son and the Daughter-in-law had experienced much trouble in their marriage, that the Daugh-

ter-in-law at one point had actually separated from the Son and filed for divorce, and that such trouble continued, at least to a lesser extent, in July 1998 when the 25 Acres was deeded to the Son and the Daughter-in-law and the Mortgage was simultaneously taken back by the Debtors.

The Trustee did not introduce into evidence a copy of the Note. Nevertheless, the Trustee contends, or at least the Court understands the Trustee to contend, that (a) the Mortgage was real, (b) the $120,000 Debt was real, (c) the Note existed, (d) the $120,000 Debt was incurred by the Nondebtor Defendants for their purchase of the 25 Acres, (e) the 25 Acres thus was not gifted outright to the Son and the Daughter-in-law, and (f) the Mortgage was satisfied and the $120,000 Debt were extinguished by the Debtors for little or no value in return from the Nondebtor Defendants. The Debtors and the Son testified that the Son made several instalment payments subsequent to July 17, 1998, with respect to the Mortgage so as to make the Mortgage look legitimate but that the amount of such payments was minimal relative to an indebtedness of $120,000. The Debtors and the Son also testified that the Debtors received nothing in the way of return value for their satisfaction of the Mortgage and extinguishment of the $120,000 Debt, other than, of course, whatever minimal payments had been made by the Son prior to the date of such satisfaction and extinguishment.

Mr. Dolata testified that the Satisfaction Piece was executed and recorded when it was because, according to Mr. Dolata, the Son and the Daughter-in-law's relationship had by that time improved. Mr. Dolata failed to offer testimony as to why he felt the need to record or satisfy the Mortgage if, as Mr. Dolata testified, the Mortgage was a sham from its inception.

## C. *Corrective Deed Property*

The Debtors conveyed away a small portion of their personal residence, otherwise known as 1033 Waterman Road, by deed dated and executed on January 11, 2001, which conveyance, according to the testimony of both the Debtors and Nondebtor Defendants, was effected because the Nondebtor Defendants had accidentally encroached upon the Debtors' personal residence when constructing upon their own personal residence. As was the case with the 25 Acres, both of the Debtors held title jointly to their personal residence including that portion thereof that they deeded to the Nondebtor Defendants on January 11, 2001. The deed for the small parcel of property that was conveyed to the Nondebtor Defendants, a certified copy of which was introduced at trial as Plaintiff's Exhibit 20, indicates that (a) "this conveyance is a corrective Deed for the purpose of correcting a legal description in a Deed recorded in DBV 10917, page 357," which latter deed, as evidenced by Plaintiff's Exhibit 21, operated to convey to the Nondebtor Defendants their personal residence, and (b) the consideration given by the Nondebtor Defendants for such parcel was "Natural Love and Affection." For convenience, and notwithstanding the aforementioned undisputed testimony to the effect that the January 11, 2001 conveyance was not really effected to correct a property description in a prior deed, the January 11, 2001 deed and the particular parcel of property conveyed thereby shall hereafter be referred to respectively as "the Corrective Deed" and "the Corrective Deed Property." The Debtors and the Nondebtor Defendants testified that the Nondebtor Defendants failed to provide any consideration of value in return for the conveyance of the Corrective Deed Property.

The deed which operated to convey to the Nondebtor Defendants their personal residence (hereafter "the Personal Residence" and "the Personal Residence Deed"), a certified copy of which was introduced at trial as Plaintiff's Exhibit 21, indicates that (a) the Debtors were the grantors of the Personal Residence, (b) it is dated and was executed on July 17, 1998, and (c) the consideration given by the Nondebtor Defendants for such parcel was "Natural Love and Affection." Notwithstanding that the Personal Residence Deed recites as consideration "Natural Love and Affection," testimony by the Debtors and the Nondebtor Defendants, as well as documentary evidence provided by the Nondebtor Defendants, establishes that the Nondebtor Defendants paid $20,000 for the Personal Residence on April 15, 1996, which date is more than two years prior to July 17, 1998. *See* Son & Daughter-in-law's Ex. C (Agreement of Sale dat. Apr. 15, 1996) & Ex. D (Copy of $20,000 check).

## D. *Orchard Drive Property*

The Debtors conveyed away realty that will hereafter be referred to as "the Orchard Drive Property" by deed dated and executed on October 31, 2000. The deed for such parcel of property (hereafter "the Orchard Drive Property Deed"), a certified copy of which was introduced at trial as Plaintiff's Exhibit 22, indicates that (a) both of the Debtors are the grantors and the Son is the grantee, (b) the consideration given by the Son for such parcel was $1.00 and "Natural Love and Affection," and (c) Mr. Dolata, prior to the execution of such deed, "was the only record title holder [of the Orchard Drive Property] as a straw party."

Mr. Dolata acquired title to the Orchard Drive Property by way of a General Warranty Deed dated and executed on August

25, 2000, wherein Mr. Dolata but not Mrs. Dolata is mentioned as the grantee (hereafter "the General Warranty Deed"). The General Warranty Deed recites that Mr. Dolata furnished consideration of $58,000 in return for the acquisition of the Orchard Drive Property. The Debtors and the Son testified that, even though the General Warranty Deed represents that Mr. Dolata paid for and acquired title to the Orchard Drive Property on August 25, 2000, the Son rather than Mr. Dolata furnished all of the $58,000 in consideration for the acquisition of such title; therefore, argue the Debtors and the Son, the Son was the rightful owner of the Orchard Drive Property prior to his acquisition of title thereto via the October 31, 2000 conveyance for $1.00. Mr. Dolata testified, and the Son acknowledged by way of his testimony, that the purpose for which Mr. Dolata originally took title to the Orchard Drive Property despite the Son's alleged furnishing at that time of the entire consideration therefor was to provide protection for the Son from the Daughter-in-law, much in the same fashion as was allegedly the case with respect to the creation of the Mortgage.

Mr. Dolata testified that, much as was the case with respect to his satisfaction of the Mortgage, he conveyed the Orchard Drive Property to the Son when he did because, according to Mr. Dolata, the Son and the Daughter-in-law's relationship had by that time improved. In fact, the Orchard Drive Property Deed was executed on October 31, 2000, which date is also when the Satisfaction Piece was executed. The Son testified that (a) it was actually he who, at some point prior to October 31, 2000, requested that Mr. Dolata transfer title to the Orchard Drive Property, and (b) he made such request of Mr. Dolata at the prompting of his bookkeeper; the Son's bookkeeper confirmed at trial that she did, indeed, prompt the Son to endeav-

or to have title to the Orchard Drive Property placed in his name.

The Trustee disputes that the Son actually furnished all of the $58,000 in consideration for the August 25, 2000 acquisition of the Orchard Drive Property, and contends, instead, that Mr. Dolata furnished anywhere from $10,000 to $40,000 of such consideration. The basis for the Trustee's contention is undisputed evidence to the effect that (a) Mr. Dolata withdrew $10,000 from the Debtors' joint checking account by way of a single check drawn on August 25, 2000, and made payable to himself, and (b) the Debtors obtained $30,000 on August 21, 2000 from Iron and Glass Bank in return for a note of equal amount coupled with the grant of a mortgage on their personal residence. Mr. Dolata, when asked at trial what he did with the $10,000 in cash that he withdrew from the Debtors' joint checking account, testified that he gambled away such money—not clear by his testimony is whether he gambled such money away at the same time that, testified Mr. Dolata, he gambled away other funds of the Debtors that emanated from Mr. Dolata's cashing in of three certificates of deposit. As for the $30,000 obtained by way of the grant of a mortgage on the Debtors' personal residence, an examination of the trial transcript fails to reveal testimony by either of the Debtors regarding the ultimate disposition of such funds.

## II. *Facts regarding alleged fraudulent conveyance of the money emanating from 3 Certificates of Deposit.*

In October 2000 Mr. Dolata closed out, prior to the dates upon which they were to mature, three separate certificates of deposit at Iron and Glass Bank, for which certificates of deposit he received, respectively, $15,000, $15,018.49, and $20,000 in cash (hereafter "the Certificates of Depos-

it"). Prior to closing out the Certificates of Deposit, each was held jointly in the names of both of the Debtors. Mr. Dolata testified that he deposited the approximately $50,000 in cash received from the closeout of the Certificates of Deposit into the Debtors' joint checking account.

The Trustee introduced as evidence copies of seven separate checks drawn by Mr. Dolata on the Debtors' joint checking account, each of which was made payable to himself on the following dates and for the following amounts: Oct. 18, 2000—$8,500; Oct. 19, 2000—$7,000; Oct. 20, 2000—$5,000; Oct. 21, 2000—$5,000; Oct. 23, 2000—$5,000; Oct. 24, 2000—$5,000; and Oct. 25, 2000—$7,000. Mr. Dolata testified that all of the money so withdrawn from the Debtors' joint checking account, or $42,500, came from the deposit into such account of the $50,000 in cash that the Debtors received from the closeout of the Certificates of Deposit.

When asked at trial what he did with the $42,500 that he so withdrew from the Debtors' joint checking account, Mr. Dolata testified that he gambled away such money all at one time, but, testified Mr. Dolata, he so gambled with a purpose in mind to win enough money so that the Debtors would then be able to pay all of their creditors who were then in existence. Mr. Dolata testified that he told nobody, including Mrs. Dolata, of his gambling excursion, that he used no credit cards during such excursion, and that he did not stay overnight as part of such excursion.

For her part, Mrs. Dolata testified that, at least prior to approximately August 14, 2002, she was unaware that (a) she and Mr. Dolata even owned the Certificates of Deposit, (b) the Certificates of Deposit had been closed out, and (c) in or about October 2000 approximately $50,000 emanating from the closeout of the Certificates of Deposit had been deposited into her joint checking account.

### III. *Facts relevant to all of the alleged fraudulent conveyance causes of action.*

On October 16, 2000, a jury verdict in the amount of $176,000 was returned against each of the Debtors in a civil fraud action tried before the Pennsylvania Court of Common Pleas for Allegheny County (hereafter "the $176,000 Verdict"). The $176,000 Verdict has since been reduced to a judgment that has subsequently been affirmed on appeal by both the Pennsylvania Superior Court and the Pennsylvania Supreme Court.

The Debtors commenced the instant bankruptcy case on March 13, 2001, by then filing their voluntary joint Chapter 7 petition, which petition the Debtors also executed on March 13, 2001. The Debtors' bankruptcy schedules, which schedules were likewise executed on March 13, 2001, and thus list the assets and liabilities of the Debtors as of March 13, 2001, reveal that the Debtors net debt—i.e., liabilities less assets—as of such date equalled $211,794.87. Such schedules also reveal that the various liabilities of the Debtors as of March 13, 2001, either (a) arose prior to, or during, October 2000, or (b) were debts which, as of October 2000, the Debtors would have expected to incur. The latter debts which the Court refers to as those which the Debtors would have expected to incur going forward from October 2000 are the tax debts which are listed in the Debtors' Bankruptcy Schedule E, which debts total $64,375.19 and are listed as having been incurred in January and March 2001; such tax debts, the Court must find, relate to tax liability for years prior to the tax year of 2001. Certain portions of Mr. Dolata's testimony relate to his solvency or insolvency at particular

points in time; however, when offering such testimony, it is clear that Mr. Dolata did not take into account his financial position were it the case that the Mortgage, the Debtors' recourse contractual claim for the $120,000 Debt, and/or the Orchard Drive Property constituted assets of the Debtors.

## IV. *Facts pertaining to the objection to the Debtors' Chapter 7 discharge.*

On March 13, 2001, the Debtors executed not only their voluntary joint Chapter 7 petition and their bankruptcy schedules but also a Statement of Financial Affairs. As was the case with respect to their bankruptcy petition and their bankruptcy schedules, the Debtors executed such Statement of Financial Affairs under penalty of perjury, declaring, in particular, and under such penalty, that they "ha[d] read the answers contained in the foregoing statement of financial affairs … and that … [such answers we]re true and correct to the best of … [their] knowledge, information, and belief." Within such Statement of Financial Affairs, the Debtors answered, *inter alia,* the following questions, and answered each of them by checking the box marked "NONE":

8. List all losses from fire, theft, other casualty or *gambling* within one year immediately preceding the commencement of this case or since the commencement of this case;

10. List all *other property,* other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case; and

11. List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, *certificates of deposit,* or other instruments….

See Pl's. Ex. 27 (Debtors' St. of Fin. Affairs) (emphasis added).

On May 10, 2001, the Debtors amended their Statement of Financial Affairs by changing their initial answer to question 10 thereon, the substance of which answer change was to reveal (a) the January 11, 2001 conveyance of the Corrective Deed Property, and (b) the October 31, 2000 conveyance of the Orchard Drive Property. See Pl's. Ex. 28. On August 14, 2002, the Debtors again amended their Statement of Financial Affairs, this time by changing their initial answer to question 11 thereon, the substance of which answer change was to reveal that, in October 2000, the Debtors had closed the Certificates of Deposit in the approximate amount of $50,000. See Pl's. Ex. 31. As was the case with respect to their Statement of Financial Affairs itself, the Debtors executed the aforementioned amendments to such Statement of Financial Affairs under penalty of perjury, declaring, in particular, and under such penalty, that they "ha[d] read the answers contained in the foregoing statement of financial affairs … and that … [such answers we]re true and correct to the best of … [their] knowledge, information, and belief."

The Trustee served the Debtors with six separate requests for production of documents between May 30, 2001, and April 25, 2002, see Pl's. Ex's. 29–30, 31A–34, all of which went unfulfilled. Thereafter, on July 25, 2002, the Court directed the Debtors to comply with the Trustee's document production requests. The Debtors complied with such order of the Court on

August 20, 2002, but only after first filing, on August 14, 2002, the second amendment to their Statement of Financial Affairs.

Conspicuously absent from the Debtors' initial and amended responses to the foregoing questions 8, 10, and 11 to their Statement of Financial Affairs are any mention of (a) the satisfaction of the Mortgage and the extinguishment of a recourse contractual claim for the $120,000 Debt on October 31, 2000, (b) the conveyance sometime after October 25, 2000, of the $42,500 that emanated from the closeout of the Certificates of Deposit, or (c) Mr. Dolata's alleged loss of such $42,500 by way of gambling.

## DISCUSSION

### I. *Fraudulent Conveyance Causes of Action.*

The Trustee contends that the four conveyances from the Debtors to the Nondebtor Defendants that are set forth above (i.e., the transfer of the 25 Acres on July 17, 1998, the satisfaction of the Mortgage on October 31, 2000, the transfer of the Corrective Deed Property on January 11, 2001, and the transfer of the Orchard Drive Property on October 31, 2000), as well as the conveyance by the Debtors sometime after October 25, 2000, of the $42,500 that emanated from the closeout of the Certificates of Deposit, are fraudulent and avoidable as such pursuant to 11 U.S.C. § 548(a)(1) and 12 Pa.C.S.A. § 5104(a). The Trustee contends, as well, that the property so conveyed to the Nondebtor Defendants may be recovered from them pursuant to 11 U.S.C. § 550(a)(1).

11 U.S.C. § 548(a)(1) provides, in pertinent part, that:

The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the peti-

tion, if the debtor voluntarily or involuntarily–

(A) made such transfer ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made ..., indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer ...; and

(ii)(I) was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer ...; [or]

. . . . .

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C.A. § 548(a)(1) (West 2003). 12 Pa.C.S.A. § 5104(a) provides, in pertinent part, that:

A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer ..., and the debtor:

. . . . .

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa.C.S.A. § 5104(a) (Purdon's 1999). 12 Pa.C.S.A. § 5104(a) is made accessible to the Trustee in her present action (a) by virtue of 11 U.S.C. § 544(b)(1), which provides in, pertinent part, that "the trustee

may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [11 U.S.C.] section 502," 11 U.S.C.A. § 544(b)(1) (West 2003), and (b) because, holds the Court summarily although it does not understand a dispute to exist, at least one unsecured creditor of the Debtors existed as of the Debtors' petition filing date on March 13, 2001.

11 U.S.C. § 548(a)(1)(B) and 12 Pa. C.S.A. § 5104(a)(2), which are frequently referred to for convenience as constructive fraudulent conveyance provisions, *see, e.g., Peltz v. Hatten*, 279 B.R. 710, 734 (D.Del. 2002); *In re C.F. Foods, L.P.*, 280 B.R. 103, 114–115 (Bankr.E.D.Pa.2002), are distinguishable, in large part, from §§ 548(a)(1)(A) and 5104(a)(1) by virtue of the fact that the former provisions, in contrast to the latter, do not require for the successful avoidance of a transfer that a debtor have had actual intent to hinder, delay, or defraud creditors. *See Peltz*, 279 B.R. at 735. Therefore, if the Trustee can successfully proceed against the Debtors under either of the constructive fraudulent conveyance provisions with respect to a transfer which she seeks to avoid as fraudulent, she need not, in order to avoid such transfer, demonstrate any actual fraudulent intent on the part of the Debtors with respect to such transfer.

■ 11 U.S.C. § 548(a)(1) and 12 Pa. C.S.A. § 5104(a), which are to be construed consistent with one another to the extent that the language of each parallels the other, *see C.F. Foods*, 280 B.R. at 115 & n. 27, are nevertheless expressly distinguishable in at least two respects that are significant to a resolution of the instant matter. First, transfers that may be subject to attack under § 548(a)(1) are limited to those that are made within one year of the date of a debtor's bankruptcy petition filing, *see* 11 U.S.C.A. § 548(a)(1), whereas a transfer generally remains assailable under § 5104(a) provided that an avoidance action is brought thereunder within four years of such transfer, *see* 12 Pa.C.S.A. § 5109 (Purdon's 1999). Second, property of a debtor the transfer of which is potentially avoidable as fraudulent under § 5104(a) does not include property that was held by such debtor in Pennsylvania prior to such transfer as a tenant by the entirety, *see In re Meinen*, 232 B.R. 827, 840 (Bankr.W.D.Pa.1999); *In re Nam*, 257 B.R. 749, 761 (Bankr.E.D.Pa.2000);[1] however, and in contrast to § 5104(a), § 548(a)(1) does not include a similar limi-

---

1. The transfer of entireties property in Pennsylvania cannot be avoided as fraudulent under § 5104(a) since § 5104(a) is a part of Pennsylvania's version of the Uniform Fraudulent Transfer Act (hereafter "Pa. UFTA"), and

because (a) a "transfer" under the Pa. UFTA is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset," 12 Pa. C.S.A. § 5101(b) (Purdon's 199[9]) (definition of "transfer"), (b) an "asset" for purposes of the Pa. UFTA "does not include ... an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant," *Id.* (definition of

"asset"), [and] (c) entireties property in Pennsylvania "is unavailable to satisfy the claims of the creditor of only one of the tenants," *Garden State Standardbred [Sales v. Seese]*, [417 Pa.Super. 15,] 611 A.2d [1239,] 1243 [(Pa.Super.Ct.1992)]; *Stinner v. Stinner*, [300 Pa.Super. 351,] 446 A.2d 651, 652 (Pa.Super.Ct.1982) (citing *Patterson v. Hopkins*, [247 Pa.Super. 163,] 371 A.2d 1378, 1382 (Pa.Super.Ct.1977)), which means that entireties property in Pennsylvania [(i)] does not constitute an "asset" under the Pa. UFTA[,]

*Meinen*, 232 B.R. at 840; *see also Nam*, 257 B.R. at 761, and (ii) consequently cannot be the subject of a "transfer" that may be avoidable under the Pa. UFTA.

tation with respect to transfers of entireties property, which means that transfers of entireties property are assailable under § 548(a)(1) even though they are not under § 5104(a), *see Nam,* 257 B.R. at 762 & 768–769 (transfer by check of $1,517.74, which funds constituted entireties property, was avoidable under § 548(a)(1) but not under the Pa. UFTA).

Applying the law set forth in the preceding paragraph to the instant matter, none of the five transfers that the Trustee seeks to avoid as fraudulent in the instant action, save for the transfer of the Orchard Drive Property on October 31, 2000, may potentially be avoided as fraudulent under § 5104(a) because (a) the property that was the subject of each such transfer, save for the Orchard Drive Property, was held in the names of both of the Debtors prior to the date of such transfer, (b) "[u]nder Pennsylvania law, '[w]here property or an account is placed in the names of a husband and wife, ... the creation of an estate by the entireties is presumed,'" *Nam,* 257 B.R. at 761 (citing *In re Estate of Holmes,* 414 Pa. 403, 200 A.2d 745, 747 (1964), and *Constitution Bank v. Olson,* 423 Pa.Super. 134, 620 A.2d 1146, 1149 (1993)); *see also Margarite v. Ewald,* 252 Pa.Super. 244, 381 A.2d 480, 482 (1977) (same, also noting that entireties presumption can only be rebutted by clear and convincing evidence to the contrary), (c) the property that was the subject of each such transfer, save for the Orchard Drive Property, is thus presumed to have constituted entireties property prior to its transfer, and (d) the record in the instant matter is devoid of evidence that would serve to overcome such entireties presumption, which thus means that the property in question constituted entireties property prior to its transfer. However, of the four transfers that the Trustee seeks to avoid as fraudulent but which may not be avoided as such pursuant to § 5104(a) due to the aforesaid entireties exception, each may potentially be avoided as fraudulent pursuant to § 548(a)(1) with the exception of the July 17, 1998 transfer of the 25 Acres. The latter conclusion follows because (a) § 548(a)(1), as set forth above, does not contain the aforesaid entireties exception to avoidance, and (b) each of the four transfers so alluded to, save for the July 17, 1998 transfer of the 25 Acres, was effectuated within the one-year period prior to the Debtors' March 13, 2001 bankruptcy petition filing. Reconciling the above, the Trustee

(a) may potentially succeed in utilizing § 548(a)(1) to avoid as fraudulent (i) the satisfaction of the Mortgage on October 31, 2000, (ii) the transfer of the Corrective Deed Property on January 11, 2001, and (iii) the conveyance sometime after October 25, 2000, of the $42,500 that emanated from the closeout of the Certificates of Deposit—the Trustee, however, cannot succeed in avoiding as fraudulent the three conveyances just referred to pursuant to § 5104(a);

(b) may potentially succeed, pursuant to either § 5104(a) or § 548(a)(1), in avoiding as fraudulent the transfer of the Orchard Drive Property on October 31, 2000—the preceding conclusion follows because (i) such property did not constitute entireties property prior to its transfer, which conclusion follows, in turn, given that such property was initially received by Mr. Dolata in his name only and then never conveyed by deed to both himself and Mrs. Dolata, and (ii) the date of such transfer is within one year of the Debtors' March 13, 2001 bankruptcy petition filing; and

(c) cannot succeed, pursuant to either § 5104(a) or § 548(a)(1), in avoiding

as fraudulent the July 17, 1998 transfer of the 25 Acres—the preceding conclusion follows because (i) the 25 Acres constituted entireties property prior to its transfer by the Debtors, thereby precluding successful access by the Trustee to § 5104(a), and (ii) the July 17, 1998 transfer of such property occurred outside of the one year period preceding the Debtors' March 13, 2001 bankruptcy petition filing.

Procedurally, the Trustee bears the burden of proof generally with respect to her fraudulent conveyance causes of action, *see C.F. Foods,* 280 B.R. at 115; *Peltz,* 279 B.R. at 735; *In re Lease-A-Fleet, Inc.,* 155 B.R. 666, 673 & 677 (Bankr.E.D.Pa.1993), and the standard of proof with respect to the same is (a) a mere preponderance of the evidence to the extent that the Trustee proceeds under a constructive fraudulent conveyance theory—i.e., pursuant to either § 548(a)(1)(B) or § 5104(a)(2)—*see C.F. Foods,* 280 B.R. at 115; *Peltz,* 279 B.R. at 735; *Lease-A-Fleet,* 155 B.R. at 677; David B. Young, *Preferences and Fraudulent Transfers,* 849 PLI/Comm 729, 860 (2003), and (b) arguably clear and convincing evidence, but perhaps just a preponderance of the evidence, to the extent that the Trustee proceeds under an actual fraudulent intent theory—i.e., pursuant to either § 548(a)(1)(A) or § 5104(a)(1)—*compare In re Foxcroft Square Co.,* 184 B.R. 671, 674 (E.D.Pa.1995) ("The requisite intent under § 357 [of Pennsylvania's repealed Uniform Fraudulent Conveyance Act ('Pa. UFCA'), which section provided for the avoidance of transfers on the basis of actu-

al fraudulent intent rather than because they are constructively fraudulent,] must be shown by clear and convincing evidence"); *Lease-A-Fleet,* 155 B.R. at 674 (standard of proof is clear and convincing evidence under either Bankruptcy Code or Pa. UFCA), *and U.S. v. Green,* 1998 WL 167278 at *10 (E.D.Pa.1998) (creditor "has the burden to show *actual intent* by clear and convincing evidence"), *with C.F. Foods,* 280 B.R. at 110 n. 14 (pointing out that *Foxcroft* was decided under the repealed Pa. UFCA, noting that "[g]enerally, courts do not [now] agree which standard applies to 'actual intent' actions under § 548(a)(1)(A)," citing cases for each proof standard, and avoiding ruling on the issue by holding that "the trustee [therein] has met the more strict 'clear and convincing evidence' standard"), *and* Young, *supra* p. 117, at 860–862 ("The strong current of opinion now holds that actual intent under 11 U.S.C. § 548(a)(1)(A) need only be shown by a preponderance of the evidence. . . . A minority of courts, however, have continued to adhere to the clear and convincing standard in § 548(a)(1)(A) cases;" also citing cases for both sides and placing the *Lease-A-Fleet* decision in the minority).[2]

If, and to the extent that, the Trustee succeeds in avoiding as fraudulent any of the transfers that she so seeks to avoid, she "may recover, for the benefit of the estate, the property [so] transferred, or, if the [C]ourt so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C.A. § 550(a)(1) (West 1993). However,

---

**2.** A resolution of the issue of which standard of proof applies to "actual intent" fraudulent conveyance actions is essentially rendered moot in the instant matter by the fact that, as set forth below, the only conveyances which are avoided as fraudulent herein are so avoid-

ed under a constructive fraud theory. As set forth above, the case authority is clear that a preponderance of the evidence proof standard applies to constructive fraudulent conveyance actions.

[a] good faith transferee from whom the [T]rustee may [so] recover ... has a lien on the property [so] recovered to secure the lesser of—

(A) the cost, to such transferee, of any improvement made after the transfer, less the amount of any profit realized by or accruing to such transferee from such property; and

(B) any increase in the value of such property as a result of such improvement, of the property transferred.

11 U.S.C.A. § 550(e)(1) (West 2003).

The Court will now proceed to address in detail each of the Trustee's fraudulent conveyance causes of action save for that which pertains to the July 17, 1998 transfer of the 25 Acres, which latter transfer, as set forth above, may not be successfully avoided as fraudulent under either § 5104(a) or § 548(a)(1).

### A. Satisfaction of the Mortgage on October 31, 2000.

The Trustee argues that the satisfaction of the Mortgage on October 31, 2000, is, *inter alia*, a constructively fraudulent transfer and avoidable as such pursuant to § 548(a)(1)(B). The Trustee argues as much because she asserts, in turn, that (a) the Debtors received nothing, that is thus much less than a reasonably equivalent value, in return for such satisfaction, and (b) the Debtors either (i) became insolvent as a result of such satisfaction, if they were not already insolvent on October 31, 2000, or (ii) intended to incur or believed that they would incur, going forward from October 31, 2000, debts that would be beyond their ability to satisfy as such debts matured. If the Trustee is correct that the satisfaction of the Mortgage on October 31, 2000, is a constructively fraudulent transfer and avoidable as such pursuant to § 548(a)(1)(B), then the Court need not, and thus will not, explore whether (a) the

Debtors possessed actual fraudulent intent when effecting such satisfaction, and (b) such transfer is also avoidable, as the Trustee argues, on the basis of such fraudulent intent pursuant to § 548(a)(1)(A).

The Court understands the Debtors and the Nondebtor Defendants to argue in response that (a) the satisfaction of a mortgage generally, and the satisfaction of the Mortgage on October 31, 2000, in particular, does not, as a matter of law, constitute a transfer within the meaning of § 548(a)(1), (b) the Mortgage was worthless on October 31, 2000, and (c) the Mortgage consequently could not have been conveyed away for less than reasonably equivalent return value.

■ The Court can, in relatively quick fashion, dispose of the legal dispute regarding whether the satisfaction of the Mortgage on October 31, 2000, constitutes a transfer within the meaning of § 548(a)(1). The satisfaction of a mortgage, in general, constitutes a transfer for § 548(a)(1) purposes because (a) "transfer" is defined in the Bankruptcy Code as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property," 11 U.S.C.A. § 101(54) (West 2003), (b) a mortgage unquestionably constitutes an interest in real property, and (c) by satisfying a mortgage, a mortgagee thereby conveys back to its mortgagor, and thus disposes of or parts with, such interest in realty. Therefore, the satisfaction of the Mortgage on October 31, 2000, constitutes a transfer for the purpose of § 548(a)(1) if the Mortgage was real.

More problematical for resolution is whether the Mortgage was worthless on October 31, 2000, and, consequently, whether the Mortgage could conceivably have been conveyed away for less than

reasonably equivalent return value. The hallmark argument of both the Debtors and the Nondebtor Defendants with respect to the preceding issue is that the Mortgage was worthless on October 31, 2000, because the same was created in the first instance only as a sham and thus was never a real asset. The Court also understands the Debtors and the Nondebtor Defendants to argue that (a) the $120,000 Debt was fake even if the Mortgage was real, and (b) the Mortgage was unenforceable, and thus worthless, for lack of an accompanying underlying debt. As well, the Court understands the Debtors and the Nondebtor Defendants to contest the enforceability—and, consequently, the worth—of the Mortgage on the ground that a copy of the Note could never have been produced.[3]

As an initial matter, the Court holds that the Trustee, as the plaintiff with respect to the constructive fraudulent conveyance action regarding the Mortgage's satisfaction, bears the burden of preponderantly proving (a) that less than reasonably equivalent value was received in return for such satisfaction, and (b) by necessity then that the Mortgage had value so that less than reasonably equivalent value could have conceivably been received in return for such satisfaction. Furthermore, because the Bankruptcy Code and Pennsylvania's state fraudulent conveyance statute are silent regarding the issue of a mortgage's value, and since there is no federal law regarding mortgages, the Court concludes that it must apply Pennsylvania law in resolving whether the Mortgage had value and, if so, how much value when it was satisfied.

### (i) *Whether the Mortgage was a sham from its inception, and whether the $120,000 Debt was fake?*

 The Mortgage, as a matter of law, was worthless (a) obviously if the same was invalid for any reason, *see* 8 P.L.E.2d *Commercial Transactions* §§ 63–66 (Bender 2000), and (b) on the basis of being unenforceable if the same was not accompanied by an underlying debt or obligation, *see* 8 P.L.E.2d *Commercial Transactions* § 12 (Bender 2000). However, the Trustee, simply by producing a certified copy of the Mortgage at trial, has presumptively proven that (a) the Mortgage was real—and thus valid—rather than fake, and (b) the $120,000 Debt was legitimate—and thus supportive of the Mortgage—rather than fake. The Court holds as it does because

(a) the certified copy of the Mortgage evidences that the same was duly executed,

(b) "[a] mortgage duly executed will be presumed to be valid until the contrary is shown, and the burden rests on the party attacking the validity of the mortgage to prove its invalidity," 59 C.J.S. *Mortgages* § 132 (West 2003); *see also* 8 P.L.E.2d *Commercial Transactions* § 66 (citing *Saalfield v. Manrow,* [165 Pa. 114,] 30 A. 823, 824 (Pa.1895), for the proposition that "[t]he burden of proof rests

---

3. The Debtors and the Nondebtor Defendants appear to actually argue as well that, even if the satisfaction of the Mortgage could presently be avoided as a fraudulent conveyance, such avoidance would be futile because (a) the Note cannot now be produced by the Trustee, and (b) an action on a mortgage, according to the Debtors, cannot, as a matter of law, be prosecuted successfully without presentation of the note underlying such mortgage. Because, as set forth *infra* pp. 50–53, an action on the Mortgage can be successfully prosecuted without the production of the Note, the Debtors and the Nondebtor Defendants are mistaken to the extent that they argue that the Mortgage would presently be worthless in any event for lack of availability of the Note.

upon the party attacking the validity of a mortgage to prove its invalidity by competent evidence"),

(c) "[a] mortgage is prima facie evidence of the existence and amount of the debt therein set forth, and the burden of proof to overcome the consideration recited in the instrument is on the mortgagor," 8 P.L.E.2d *Commercial Transactions* § 13 (Bender 2000) (citing, *inter alia, Saalfield v. Manrow,* 30 A. at 824); *see also In re: Condemnation by the Commonwealth of Pennsylvania, Dept. of Transportation, of Right of Way for Legislative Route 1021, et al.,* 1978 WL 14733 at 3 (Pa.Com.Pl.Ct.1978) ("the burden of the party challenging a recorded ... mortgage, that is, to prove the lack of consideration, was not met by Travelers Indemnity," the party challenging the mortgage therein); 54A Am.Jur.2d *Mortgages* § 31 (West 2003); 59 C.J.S. *Mortgages* § 101 (West 2003), and

(d) the certified copy of the Mortgage thus presumptively proves that (i) the Mortgage was valid rather than fake, and (ii) the $120,000 Debt was legitimate rather than fake.

As a result of the foregoing, the Debtors and the Nondebtor Defendants, in order to successfully argue that the Mortgage was worthless, bear the burden of proving that (a) the Mortgage was invalid from its inception on the basis that it was a sham, or (b) the $120,000 Debt was fake. The appropriate standard of proof by which the Debtors and the Nondebtor Defendants must carry such burden is a preponderance of the evidence. *See* 59 C.J.S. *Mortgages* § 132 (clear and convincing evidence

is only necessary where validity of mortgage is attacked on grounds of fraud, duress, or undue influence); 8 P.L.E.2d *Commercial Transactions* § 66 (same); 8 P.L.E.2d *Commercial Transactions* § 13 ("competent evidence" is necessary to successfully challenge a consideration recital in a mortgage).

■ To the extent that the Debtors and the Nondebtor Defendants argue that, because they are merely defendants in the instant action for which the Trustee bears the ultimate burden of proof, they can prevail against the Trustee's assertions that the Mortgage was valid and that the $120,000 Debt was legitimate without carrying the burden of proving the negative of such assertions, the Court rejects such argument. The Court rejects such argument because

(a) Pennsylvania state law clearly provides that the effect of the two presumptions detailed above—i.e., that a duly executed mortgage is presumed to be valid and that the debt therein stated is presumed to exist for the amount therein stated—is to impose on the party against whom such presumptions are directed not only the burden of going forward with evidence to rebut or meet such presumptions but also the burden of proof in the sense of the risk of nonpersuasion, that is the burden of establishing the nonexistence of the presumed facts,[4] *see supra* pp. 119 – 120 (case and treatise authorities cited at paragraphs (b) and (c) require party against whom presumptions are directed to prove the nonexistence of the presumed facts), and

---

4. Pennsylvania's Rules of Evidence do not affect the two presumptions in question, *see* Pa.R.Evid. 301, 42 Pa.C.S.A. (Purdon's 1999), and "Pa.R.E[vid]. 301 differs from F[ed].R.E[vid]. 301 in that ... [Pa.R.Evid. 301] does not establish the effect of a presumption on the burden of proof," Pa.R.Evid. 301, 1998 cmt.

(b) Pennsylvania's rule regarding the effect of the two presumptions in question controls in the instant matter rather than the rule set forth in Fed.R.Evid. 301 that a presumption does not shift to the party against whom a presumption is directed the burden of proof in the sense of the risk of nonpersuasion, *see* Fed.R.Evid. 301, 28 U.S.C.A. (West 2001), given that (a) "the effect of a presumption respecting a fact which is an element of a claim or defense as to which [s]tate law supplies the rule of decision is determined in accordance with [s]tate law," Fed.R.Evid. 302, 28 U.S.C.A. (West 2001), and (b) Pennsylvania state law, as set forth above *supra* p. 119, supplies the rule of decision regarding that portion of the Trustee's claim respecting the value of the Mortgage when it was satisfied, *cf. In re Jackson*, 28 B.R. 559, 562–563 (Bankr.E.D.Pa.1983) ((1) in a bankruptcy proceeding, state law supplied the rule of decision regarding the existence of a partnership since the Bankruptcy Code does not define the term "partnership," (2) state presumption is against the existence of a partnership and "[t]he burden of proof [to establish otherwise] lies with the party or parties seeking to prove the existence of the partnership," and (3) consequently, state rule regarding the effect of state presumption, that is the aforesaid placement of the burden of proof, applied in such bankruptcy proceeding pursuant to Fed.R.Evid. 302); *In re Bahre*, 23 B.R. 460, 462 n. 1 (Bankr.D.Conn.1982) (in bankruptcy proceeding in which state fraudulent conveyance statute was applied, the effect of state presumption regarding want of consideration for an intra-family conveyance, that is whether or not such presumption shifted the burden of proof, is determined by state law rule in accordance with Fed.R.Evid. 302); *Welsh v. United States*, 844 F.2d 1239, 1243 (6th Cir. 1988) (in Federal Tort Claims Act action, liability is determined according to state substantive law, and the effect of state presumptions, pursuant to Fed.R.Evid. 302, is determined according to state law rules).[5]

5. The Debtors and the Nondebtor Defendants argue that the burden of proof in a fraudulent conveyance action never shifts from a plaintiff to a defendant, cite to the decision in *C.F. Foods* as supportive of such proposition, and likely argue, in turn, that the two Pennsylvania presumptions discussed above accordingly should not be applied in the instant matter so as to place upon them the burden of proving that the Mortgage was invalid and that the $120,000 Debt was fake. Unfortunately for the Debtors and the Nondebtor Defendants, the only instance of burden shifting that *C.F. Foods* explicitly dealt with was that which was formerly practiced within the context of a constructive fraud action brought under the now-repealed PA. UFCA, to wit "that after the creditor ... shows that the grantor was in debt at the time of the conveyance, 'the burden shifts to the grantees to establish ... either that the grantor was then solvent and not rendered insolvent by the conveyance, or that he received fair consideration for the conveyance.'" *C.F. Foods*, 280 B.R. at 113. This Court shall confine *C.F. Foods'* prohibition regarding burden shifting to precisely that type of burden shifting which the *C.F. Foods* court was faced with when it ruled. Accordingly, because *C.F. Foods* did not deal with burden shifting within the context of a fraudulent conveyance action that is mandated by the effect of a state law presumption, particularly, as in the instant matter, a presumption regarding real property or financial instruments, this Court shall rule that *C.F. Foods* is simply inapposite with respect to such burden shifting in general, or with respect to the burden shifting encountered in the instant matter in particular.

Therefore, have the Debtors and the Non-debtor Defendants preponderantly proven that (a) the Mortgage was a sham, or (b) the $120,000 Debt was fake?

### (a) *Whether the Mortgage was a sham from its inception?*

As an initial matter, the Court notes that only Mr. Dolata and the Son testified that they knew that the Mortgage was fake from its inception; Mrs. Dolata testified that she did not even execute the Mortgage and was unaware of its existence while the Daughter-in-law testified that she thought the Mortgage was real. The Court can only conclude from the testimony of Mr. Dolata and the Son to the effect that the Mortgage was fake from its inception that they both now contend—the Mortgage itself and their actions with regard to the same notwithstanding—that (a) they did not have an actual intent to enter into the agreement embodied in the Mortgage when they executed the same, (b) they both had, instead, a secret intent at such time that they were not entering into the agreement that is embodied in the Mortgage, and (c) the agreement embodied in the Mortgage thus never really existed as a legal matter. Can Mr. Dolata and the Son, and thus Mrs. Dolata and the Daughter-in-law as well, prevail with respect to such position? For several reasons, the Court holds that they cannot.

First, "mortgages are [generally] governed by the same rules of construction that apply to other written instruments[ and t]he primary task in interpretation of a mortgage is the ascertainment of the intentions of the parties." 8 P.L.E.2d *Commercial Transactions* § 81 at 201 (Bender 2000). "It is a general principle that there can be no contract unless all the parties involved intend to enter into one." 16 Summ. Pa.Jur.2d *Commercial Law* § 1:17 (West 2003). However,

[a] true and actual meeting of the minds is not necessary to form a contract. In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter.... [I]t matters not whether ... [a party] truly believed a contract did not exist *if* his manifested intent reasonably suggested the contrary to ... [another party]. Furthermore, a contract could be formed even if ... [the former party] did not contemplate that legal consequences would attach to the transaction.

*Ingrassia Construction Co., Inc. v. Walsh,* 337 Pa.Super. 58, 486 A.2d 478, 482–483 (1984) (emphasis theirs) (citations and footnotes omitted); *see also Long v. Brown,* 399 Pa.Super. 312, 582 A.2d 359, 363 (1990) (same); *General Warehousemen and Employees Union Local No. 636 v. J.C. Penney Co.,* 484 F.Supp. 130, 135 (W.D.Pa. 1980) (same); *Delaware, L. & W.R. Co. v. Monroe County Water Power & Supply Co.,* 227 Pa. 639, 76 A. 425, 425 (1910) (same); *Gallo v. Howard Stores Corp.,* 145 F.Supp. 909, 912 (E.D.Pa.1956) (same); *In re Pennsylvania Footwear Corp.,* 204 B.R. 165, 176 (Bankr.E.D.Pa.1997); 16 Summ. Pa.Jur.2d *Commercial Law* § 1:17 (same); *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814–815 (7th Cir.1987) (applying the law of Wisconsin, which, like Pennsylvania, "takes an objective view of 'intent,'" and noting that (a) such "'intent' does not invite a tour through ... [a party's] cranium, with ... [such party] as the guide," (b) "'[t]he intent of the parties [to be bound] must [instead] necessarily be derived from a consideration of their words, written and oral, and their actions,'" and (c) "[s]ecret hopes and wishes count for nothing"). As well, "[a] party's subjective intent will form the basis of a contract only if the other party knows or has reason to

know of the intent." *Ingrassia Construction*, 486 A.2d at 483 n. 5; *see also Delaware, L. & W. R.*, 76 A. at 425 (same); 16 Summ.Pa.Jur.2d *Commercial Law* § 1:17 (same). Reconciling all of the foregoing law, the Court holds, as a legal matter, that a party's subjective intent that a contract not be formed will only have legal relevance if the other party knows or has reason to know (i.e., should reasonably know) of such intent.[6]

■ Applying the law set forth in the preceding paragraph to the instant matter, the Court is constrained to hold that (a) Mr. Dolata and the Son intended to enter into the agreement that is embodied in the Mortgage, and (b) the Mortgage thus existed as a legal matter, and therefore was not fake, from the moment of its inception. The Court is so constrained because

(a) the Daughter-in-law, who was a party to the Mortgage, was indisputably unaware of the alleged secret intentions of Mr. Dolata and the Son that the Mortgage not be binding,

(b) the Daughter-in-law had no reason to know—i.e., a reasonable person would not have known—of such secret intention that was allegedly harbored by Mr. Dolata and the Son, particularly given (i) the authentic appearance of the Mortgage document itself, (ii) that the Mortgage document was notarized, (iii) that the Mortgage was executed at the same time that the Debtors conveyed the 25 Acres to the Nondebtor Defendants, which realty, in turn, then served to comprise a portion of the realty that was subject to the Mortgage, and (iv) that the Debtors

had charged the Nondebtor Defendants $20,000 for the Personal Residence just two years earlier, which fact, when combined with the other circumstances just referred to, would lead a reasonable person to conclude that the Debtors were exacting a charge for, rather than gifting away, the 25 Acres, and

(c) the alleged secret intention of Mr. Dolata and the Son, and thus their testimony regarding such subjective intention, are therefore legally irrelevant with respect to the existence of a binding agreement in the form of the Mortgage—what is legally relevant, instead, are the outward and objective manifestations of assent by Mr. Dolata and the Son that reasonably suggested to the Daughter-in-law that they intended to enter into the agreement that is embodied in the Mortgage.

■ The Court also holds that, even if it could permissibly consider whether Mr. Dolata and the Son secretly intended not to contract when they executed the Mortgage, Mr. Dolata and the Son nevertheless have failed to preponderantly prove that they harbored such subjective intent. The Court holds as it does for several reasons.

■ First, Mr. Dolata and the Son, despite the fact that they would bear the burden of proof on the issue of their subjective intent were such subjective intent relevant, produced at trial scantly more than their own bare self-serving testimony regarding such secret intent, the credibility of which testimony is severely hindered

---

**6.** The statement of the law preceding the instant footnote can be squared with case authority that exists to the effect that sham agreements are unenforceable for lack of an intent to contract because such case authority is uniform that, with respect to such agreements, all of the parties involved are aware of each other's intent that a contract not be formed. *See* 29A Am.Jur.2d *Evidence* § 1109 (West 2003), as well as the numerous case authorities cited therein, for confirmation of the preceding conclusion.

necessarily by its self-serving nature. The Court concludes summarily that such testimony by Mr. Dolata and the Son is insufficient, by itself, to establish preponderantly the existence of their alleged secret intent. The Debtors argue nevertheless that (a) the Trustee, because she called Mr. Dolata as her witness, is, as a matter of law, bound by Mr. Dolata's testimony pursuant to Fed.R.Evid. 607 unless such testimony is impeached, (b) Mr. Dolata's testimony was not impeached, and (c) the Trustee is thus bound by Mr. Dolata's testimony. Indeed, the law is that a party is bound by the testimony of its own witness, but, and as the Debtors even acknowledge, such rule only applies where that testimony "is not contradicted or impeached by other evidence," *Slater v. Erie Lackawanna Railway Co.*, 300 F.Supp. 1, 3 (W.D.Pa. 1968); *see also Ayoub v. Spencer*, 407 F.Supp. 354, 360 (E.D.Pa.1976) (same); such rule also does not apply "where the testimony is inherently improbable, or where testimony is based upon a mere guess," *Slater*, 300 F.Supp. at 4. Applying the foregoing law, since the Trustee called Mr. Dolata as her witness, she needed to impeach his testimony—even though the same was self-serving and thus unpersuasive—in order to prevent a necessary finding by the Court that the substance of his testimony was true. Unfortunately for the Debtors, Mr. Dolata's testimony regarding the secret intent of himself and the Son is easily contradicted and impeached by the following evidence:

(a) The testimony of Mr. Dolata that he wished for the Mortgage to provide protection to the Son from the Daughter-in-law, as well as the testimony of (i) the Son acknowledging such purpose behind the Mortgage, and (ii) Mrs. Dolata to the effect that she also wished to obtain protection for the Son from the Daughter-in-law, and notwithstanding her alleged lack of formal participation in the creation of the Mortgage. Such testimony is, in contrast to the self-serving testimony regarding secret intent recounted above, very credible. Because the Court is thereby persuaded that Mr. Dolata wished for the Mortgage to provide the aforementioned protection to the Son, the Court cannot accept that Mr. Dolata (i) actually wished for the Mortgage to not have binding effect, and (ii) wished, albeit unwittingly, for the Mortgage to be unenforceable. The Court so finds because, in order for the Court to find that Mr. Dolata desired that the Mortgage not have binding effect, the Court would then also have to find that Mr. Dolata wished to be illusory the protection that was to be afforded by the Mortgage, which, in turn, would then require the Court to find that Mr. Dolata intended to undertake what he then perceived to be a futile act; of course, the latter two findings are entirely untenable, which compels the Court to conclude that Mr. Dolata subjectively intended for the Mortgage to have binding effect and to thus be enforceable;

(b) The fact that the Mortgage was satisfied. If Mr. Dolata subjectively intended for the Mortgage not to be binding and therefore to be unenforceable, and thus subjectively intended for the Mortgage to be fake from its inception, then why did Mr. Dolata feel the need to satisfy the Mortgage? Perhaps Mr. Dolata satisfied the Mortgage only so as to cover all bases in the event, not all that unlikely as it turns out, that the Mortgage was real rather than fake. However, the Court finds it to be not only at least equally, but in fact

much more, likely than not that Mr. Dolata satisfied the Mortgage because he not only suspected but hoped that the Mortgage was binding and enforceable up until the point of its satisfaction;

(c) The fact that the Mortgage was recorded shortly after its execution. That the Mortgage was recorded is harder to square with a secret intention that the Mortgage be fake than is the fact that the Mortgage was ultimately satisfied because, if Mr. Dolata intended for the Mortgage to be fake, then what possible purpose could have been served by subsequently recording it? Indeed, and as set forth in the immediately preceding paragraph (a), if Mr. Dolata intended for the Mortgage to be fake, then he only sought illusory protection for the Son at best, such as, for instance, to throw off the Daughter-in-law; however, it is unlikely that the Daughter-in-law would have been made aware of the Mortgage's recording in any event, which thus raises the issue of how a recording of the Mortgage could have had any deceptive value vis-a-vis the Daughter-in-law. Moreover, the law is clear that a mortgage need not be recorded in order to be enforceable against a mortgagor, even though the same must be recorded in order to create a lien as against all others. *See In re Fortescue*, 122 F.Supp. 883, 884 (E.D.Pa.1954); *In re W. McLaughlin*, 28 B.R. 573, 575 (Bankr.E.D.Pa.1983); *In re E. McLaughlin*, 28 B.R. 575, 576 (Bankr.E.D.Pa.1983); *In re Rice*, 126 B.R. 189, 192 (Bankr.E.D.Pa. 1991); 8 P.L.E.2d *Commercial Transactions* § 67 (Bender 2000). Therefore, the Mortgage was enforceable against the Daughter-in-law, who was a mortgagor, without the aid of recording the same, which point thus also raises the issue of how a recording of the Mortgage could have served to deceive the Daughter-in-law. In fact, since a recording of the Mortgage accomplished nothing other than to provide the Debtors with priority regarding the Mortgage vis-a-vis creditors or subsequent mortgagees or purchasers of the Nondebtor Defendants, such recording can only lead the Court to find that Mr. Dolata subjectively intended, by way of the Mortgage, to protect the Son not only from the Daughter-in-law but from the creditors of the Son's sole proprietorship as well, which finding, in fact, is consistent with certain of Mrs. Dolata's testimony, *see supra* p. 109. In any event, that the Mortgage was recorded, particularly when coupled with the other pieces of evidence referred to in the immediately preceding paragraphs (a) and (b), compels the Court to conclude that it is not only at least equally, but in fact much more, likely than not that Mr. Dolata subjectively intended for the Mortgage to have binding effect, to thus be enforceable, and to thus be real rather than fake; and

(d) The execution of the Mortgage document itself, which execution not only provides the Trustee with a presumption in her favor that the Mortgage was valid rather than fake but also provides compelling proof that Mr. Dolata subjectively intended for the Mortgage to have binding effect, to thus be enforceable, and to thus be real rather than fake.

Because the foregoing evidence serves to impeach Mr. Dolata's testimony, the Trus-

tee is not bound by such testimony,[7] which testimony, as set forth above, is wholly insufficient, by itself or in conjunction with the Son's testimony, to establish preponderantly the existence of Mr. Dolata's and the Son's alleged secret intent. Second, so strong, in the Court's view, is the evidence set forth *supra* pp. 124 – 125 (¶¶ (a)—(d)) that the Court holds that, were it the Trustee's burden to prove the negative of Mr. Dolata's and the Son's alleged secret intent not to contract, the Trustee has successfully carried such burden. Because such evidence is that strong, such evidence certainly suffices to make it at least equally likely that Mr. Dolata and the Son did not possess the secret intent that they now profess to have had, which finding necessarily means that Mr. Dolata and the Son have not successfully carried their burden of proof regarding such secret intent.

Therefore, the Court concludes that Mr. Dolata and the Son intended, both outwardly and secretly, that is to say both objectively and subjectively, to enter into the agreement that is embodied in the Mortgage, which means that the Mortgage was real rather than fake from its inception.

### (b) *Whether the $120,000 Debt was fake?*

■ The Court holds, for several reasons, that Mr. Dolata and the Son, who also bear the burden of proof on the issue of the lack of an underlying debt, have failed to preponderantly prove that the $120,000 Debt was fake. First, and once again, Mr. Dolata and the Son, despite the fact that they bear such burden of proof, produced at trial scantly more than their own bare self-serving testimony regarding the legitimacy of the $120,000 Debt. The credibility of such testimony is, as was the case respecting the testimony of Mr. Dolata and the Son regarding their secret intention not to contract by way of the Mortgage, severely hindered by virtue of its self-serving nature. The Court concludes summarily that such testimony by Mr. Dolata and the Son is insufficient, by itself, to establish preponderantly that the $120,000 Debt was fake. Therefore, if the Trustee had refrained from calling Mr. Dolata as her own witness, the Trustee would prevail with respect to the defense of the lack of an underlying debt even without producing any responsive evidence. However, because the Trustee called Mr. Dolata as a witness, she needed to produce some evidence to contradict or impeach his rather frail testimony so as not to be bound by such testimony. The Court concludes that Mr. Dolata's testimony that the $120,000 Debt was illegitimate is contradicted and impeached by the following evidence:

(a) The execution of the Mortgage document itself, which execution not only provides the Trustee with a presumption in her favor that the $120,000 Debt stated on the face of the Mortgage was legitimate but also provides compelling proof of the same;

(b) The credible testimony of Mr. Dolata that, as set forth above, serves to persuade the Court that Mr. Dolata subjectively intended for the Mortgage to be binding and enforceable, coupled with the fact that (i) the Mortgage document is a standard pre-printed form document with blanks the pre-printed portion of which form contains an affirmative

---

7. The Court also reminds all that, even were the Trustee bound by the testimony of Mr. Dolata, in which case the same would have to be taken by the Court to be true, the mere fact that Mr. Dolata and the Son possessed such subjective intent is, for the reasons set forth earlier herein, legally irrelevant in any event, *see supra* pp. 122 – 123.

representation that an underlying debt exists, and (ii) Mr. Dolata inserted the amount of $120,000 into the blank provided in the Mortgage document that immediately follows such pre-printed representation to the effect that there exists an underlying debt. Because the Mortgage document expressly represents that there exists a debt that underlies the Mortgage, and since Mr. Dolata took care to insert the amount of $120,000 into the blank provided in the Mortgage document that immediately follows such representation, the Court must conclude that Mr. Dolata at least labored under the assumption, if he was not in fact acutely aware, that a mortgage needs, and thus is generally unenforceable absent the existence of, an underlying debt—indeed, if Mr. Dolata had not at least labored under such assumption, and, as Mr. Dolata now maintains, the $120,000 Debt really was fake, then he would have had no reason to insert into, and instead would have omitted from, the Mortgage document the aforesaid debt recitation. Because the Court concludes that Mr. Dolata at least thought that a mortgage is generally unenforceable absent the existence of an underlying debt, and since the Court concludes as well, based upon his testimony and that of others, that Mr. Dolata subjectively intended for the Mortgage to be enforceable, the Court thereby concludes, in turn, that Mr. Dolata subjectively intended to, and did in fact, create a valid underlying debt for $120,000;

(c) The fact that the 25 Acres Deed was executed at the same time that the Mortgage was executed, coupled with the testimony (i) of Mr. Dolata that he wanted to take back a mortgage for protection purposes as part of the transaction whereby the Debtors conveyed the 25 Acres to the Nondebtor Defendants, and (ii) of Mrs. Dolata that she wished, as part of such conveyance, that a device be put in place to provide the Son with protection as against the Daughter-in-law. The preceding provides strong evidence that (i) the debt secured by the Mortgage—i.e., the $120,000 Debt—was incurred by the Nondebtor Defendants for the purchase of the 25 Acres, and (ii) the $120,000 Debt was, thus, legitimate; and

(d) The testimony of the Daughter-in-law that she thought (i) the $120,000 Debt was legitimate, (ii) such debt was incurred for the purchase of the 25 Acres, and (iii) the Mortgage was given by herself and the Son to secure their payment of the $120,000 Debt. Such evidence is supportive of a finding that (i) the debt secured by the Mortgage—i.e., the $120,000 Debt—was incurred by the Nondebtor Defendants for the purchase of the 25 Acres, and (ii) the $120,000 Debt was, thus, real.

Because the foregoing evidence serves to impeach Mr. Dolata's testimony, the Trustee is not bound by such testimony, which testimony, as set forth above, is wholly insufficient, by itself or in conjunction with the Son's testimony, to establish preponderantly that the $120,000 Debt was fake. Second, so strong, in the Court's view, is the evidence set forth *supra* pp. 126 – 127 (¶¶ (a)—(d)) that the Court holds that, were it the Trustee's burden to prove the negative of Mr. Dolata's and the Son's allegation that the $120,000 Debt was fake, the Trustee has successfully carried such burden. Because such evidence is that strong, such evidence certainly suffices to

make it at least equally likely that the $120,000 Debt was legitimate, which finding necessarily means that Mr. Dolata and the Son have not successfully carried their burden of proof regarding the lack of an underlying debt.

Therefore, the Court concludes that the $120,000 Debt was legitimate rather than fake.

 In ruling as the Court does, the Court recognizes the argument of Mr. Dolata and the Son that the $120,000 Debt (a) could not have been incurred by the Nondebtor Defendants for any reason other than their acquisition of the 25 Acres, (b) was not incurred for the purchase of the 25 Acres either, and (c) must thus have been fake. The Court acknowledges, as well, that Mr. Dolata and the Son produced at trial one piece of non-testimonial evidence in support of their position that the $120,000 Debt was not incurred for the purchase of the 25 Acres, namely the recital in the 25 Acres Deed that the consideration given in return for the conveyance of the 25 Acres was the Son's and the Daughter-in-law's love and affection—i.e., that such conveyance was a gift. Unfortunately for Mr. Dolata and the Son, such consideration recital, for several reasons, does not serve to prove that the $120,000 Debt was fake. First, because the consideration

recital in the 25 Acres Deed says nothing about whether the $120,000 Debt was incurred for a reason other than to purchase the 25 Acres, Mr. Dolata and the Son, by virtue of such consideration recital, have thereby preponderantly proven neither that such debt was not incurred for a reason other than such purchase nor, consequently, that such debt was fake. Second, and notwithstanding the law in Pennsylvania that "[t]he consideration stated in a deed, or in a receipt at the foot of a deed, is prima facie evidence of the real consideration" given, 21 P.L.E.2d *Deeds* § 132 (Bender 2003); *see also* 21 P.L.E.2d *Deeds* §§ 53 & 134 (Bender 2003) (a consideration recital in a deed constitutes prima facie evidence of a valuable consideration), which law, when coupled with the aforesaid consideration recital in the 25 Acres Deed, serves to create a presumption that would operate to place upon the Trustee the burden of proving, by clear and convincing evidence,[8] that the 25 Acres was not gifted, Mr. Dolata and the Son have not preponderantly proven that the 25 Acres was gifted or, stated differently, that the $120,000 Debt was not incurred for the purchase of the 25 Acres. The Court draws the conclusion in the preceding sentence because the Court concludes, in turn, that the Trustee has overcome the afore-

8. In Pennsylvania, as elsewhere, "[w]here a deed, regular on its face, is attacked as invalid, the burden of proof rests on the person attacking the deed to establish its invalidity," 21 P.L.E.2d *Deeds* § 133 (Bender 2003), and such burden must be carried by clear and convincing evidence, *see* 21 P.L.E.2d *Deeds* § 134. Although the Court is unable to locate any case or treatise authority in Pennsylvania regarding the burden and appropriate standard of proof when attacking a deed recital other than within the context of also attacking a deed as invalid, authorities from various other states make clear that (a) such burden is placed upon the party instigating such attack, and (b) such standard of proof is one of clear and convincing evidence. *See Henderson v.*

*Henderson,* 694 S.W.2d 31, 34 (Tex.App. 1985); *Sims v. Duncan,* 195 S.W.2d 156, 159 (Tex.Civ.App.1946); *Howell v. Fiore,* 210 So.2d 253, 256 (Fla.Dist.Ct.App.1968); *United States v. Bachman, et al.,* 1981 WL 1934 at *3 (S.D.Iowa 1981); *Frederick v. Shorman,* 259 Iowa 1050, 147 N.W.2d 478, 483 (Iowa 1966); *Anderson v. Associated Investment Co.,* 219 Cal.App.2d 206, 32 Cal.Rptr. 921, 924 (1963); *Cheney's Adm'r v. Houston,* 238 Ky. 410, 38 S.W.2d 198, 200 (1931); 26A C.J.S. *Deeds* § 429 (West 2003) (citing Arkansas law to the effect that "[a] mere preponderance of parol evidence is sufficient to show an additional consideration not mentioned in the deed, but not where the proof is in conflict with the recitals of the deed").

said presumption by sufficiently proving— that is, proving by clear and convincing evidence—instead that (a) the 25 Acres, in fact, was not gifted to the Nondebtor Defendants, and (b) the $120,000 Debt was incurred for the purchase of such realty. The Court so concludes because (a) the Mortgage, which refers to the $120,000 Debt, was executed at the same time that the 25 Acres Deed was executed, (b) the Mortgage encumbers, *inter alia*, the 25 Acres, (c) of Mr. Dolata's testimony that he intended to and did take back the Mortgage as part of the transaction whereby the 25 Acres was conveyed to the Nondebtor Defendants, (d) of the Daughter-in-law's testimony that she thought that the Son and herself had purchased the 25 Acres for $120,000, and (e) of the consideration recital contained in the Personal Residence Deed, which consideration recital serves to cast substantial doubt upon the accuracy of the consideration recitation contained in the 25 Acres Deed. With respect to the last point made in the preceding sentence, the Personal Residence Deed, *which deed was also executed on the same date as the 25 Acres Deed,* recites as consideration given for the Personal Residence the love and affection of the Son and the Daughter-in-law. However, the Son and the Daughter-in-law, as established by undisputed testimonial and documentary evidence, paid $20,000 for the Personal Residence, which means that the consideration recitation contained in the Personal Residence Deed is wholly inaccurate. Because the two deeds were executed at the same time, and since the consideration recitals contained in both deeds are identical, and given that the consideration recitation contained in the Personal Residence Deed is clearly inaccurate, the Court must at least doubt, and to a significant degree, the accuracy of the consideration recitation contained in the 25 Acres Deed.[9] In light of

9. The Court concludes that the 25 Acres Deed must be construed with the Mortgage because (a) the law in Pennsylvania is that "[i]n the construction of a deed, separate or different instruments may be construed with the deed when they are executed at the same time, and relate to the same subject matter, and are between the same parties," 21 P.L.E.2d Deeds § 51 (Bender 2003); *see also* 8 P.L.E.2d *Commercial Transactions* § 81 ("Where another written instrument is given as a part of the same transaction as the mortgage, the two instruments should be read and considered together, and the terms of the mortgage may thus be modified by the contents of the other writing"); *Housing Mortgage Corp. v. Allied Const., Inc.,* 374 Pa. 312, 97 A.2d 802, 804–805 (1953) (cited in 8 P.L.E.2d Commercial Transactions § 81 to the effect that "where a purchase money *mortgage,* a *deed,* an advance money mortgage, and a construction loan agreement were all executed with respect to the same transaction, they were all to be interpreted together, in determining the effect of the mortgage"), (b) the 25 Acres Deed and the Mortgage were executed at the same time—i.e., on July 17, 1998, (c) the parties to both the 25 Acres Deed and the Mortgage were identical—i.e., each of the Debtors and the Nondebtor Defendants, and (d) the Mortgage, according to a particular portion of Mr. Dolata's testimony which the Court finds to be credible, was to be taken back as part of the transaction whereby the Debtors conveyed the 25 Acres to the Nondebtor Defendants. However, that the 25 Acres Deed must be construed with the Mortgage does not negatively affect the presumptions that attach to either the consideration recital in the 25 Acres Deed or the representation in the Mortgage as to the existence of the $120,000 Debt. The Court so concludes because the language of such consideration recital does not conflict with the language in the Mortgage as to the existence of the $120,000 Debt—no conflict exists since the Mortgage does not say that the $120,000 Debt was incurred for the purchase of the 25 Acres.

As an aside, the Court notes that, if it were the case that the Mortgage affirmatively represented that the $120,000 Debt was incurred for the purchase of the 25 Acres, such as, for instance, if the Note, which is referenced by the Mortgage, contained such a representation, then the Court, construing the Mortgage and the 25 Acres Deed together, would, for

the foregoing, the consideration recital contained in the 25 Acres Deed does not serve to prove that the $120,000 Debt was fake.

That the Mortgage was real, that the $120,000 Debt was legitimate, and that the $120,000 Debt was incurred for the conveyance of the 25 Acres can also be reconciled with the Debtors' testimony that they subjectively intended to gift rather than to sell the 25 Acres to the Son. The Court so holds because (a) the Debtors could have effected such donative intent notwithstanding the creation of an enforceable debt obligation and mortgage by simply refraining from collecting on such debt or enforcing such mortgage, and (b) evidence exists to support a finding that the Debtors, in fact, effectuated such a plan, to wit (i) they refrained from collecting on or enforcing the Mortgage in years subsequent to its execution, and (ii) they satisfied the Mortgage and extinguished the $120,000 Debt several years later, thereby permanently effectuating their subjective intent to gift the 25 Acres. In fact, and in light of all of the findings and conclusions that the Court has made thus far, the Court finds that the Debtors, or at least Mr. Dolata, subjective-ly intended to, and did, effectuate the plan as just postulated by the Court in the preceding sentence.

#### (ii) *Whether the Mortgage was unenforceable because of the inability to produce the Note?*

For several reasons, the unavailability of the Note did not, and shall not, render the Mortgage either unenforceable or, consequently, worthless. First, the production of an accompanying bond or note, as a matter of law, is not essential to a mortgagee's right of action on a mortgage, *see Anderson v. Kern,* 259 Pa. 81, 102 A. 427, 427 (1917); *Brownell v. Oviatt,* 215 Pa. 514, 64 A. 670, 670 (1906) (noting also that a suit on the mortgage is "a cause of action separate and distinct from that on the bond … though both [a]re for the same debt"); 22 Stand.Pa. Pract.2d *Enforcement of Real Property Mortgages* §§ 121:74 & 121:75 (West 2003) (citing *Anderson* and *Brownell* decisions); 8 P.L.E.2d *Commercial Transactions* §§ 230–232 (Bender 2000) (citing *Anderson* and *Brownell* decisions),[10] which means, in turn, that a mortgage's value is not lost or diminished in any way simply

---

the reasons set forth *supra* pp. 129–130, arrive at a construction such that the consideration given for the 25 Acres was both love and affection and $120,000. Of course, such a construction would affect the presumption that would attach to the consideration recital, then to be gathered from both the Mortgage and the 25 Acres Deed, because such presumption would then be not that the 25 Acres was gifted but instead that such realty was conveyed for love and affection plus $120,000; significantly, however, and of course, such a construction would not negatively affect, but would instead buttress, the finding that the $120,000 Debt was legitimate.

10. The Court notes that Pennsylvania's Rules of Civil Procedure are consistent with the authorities set forth in the text immediately preceding the instant footnote. In particular, such procedural rules that deal specifically with actions of mortgage foreclosure do not require that a mortgagee produce at trial a copy of the note underlying the mortgage to be foreclosed upon. *See* Pa.R.Civ.P. 1141–1150, 42 Pa.C.S.A (Purdon's 2002). As well, Pa.R.Civ.P. 1019(i), which rule provides, in pertinent part, that "[w]hen any claim … is based upon a writing, the pleader shall attach a copy of the writing, or the material part thereof," Pa.R.Civ.P. 1019(i), 42 Pa.C.S.A. (Purdon's 2002), does not compel a mortgagee to attach to its foreclosure complaint a copy of the note underlying the mortgage to be foreclosed upon because (a) such rule only requires that a writing be attached when the claim sued upon is based upon such writing, and (b) a cause of action on the mortgage is separate and distinct from that, and is thus not based, on the underlying note, *see Brownell,* 64 A. at 670.

because a mortgagee is, or will be, unable to produce an accompanying bond or note when suing on the mortgage. Applying the foregoing law to the instant matter, the Debtors and the Nondebtor Defendants cannot prevail with respect to their position that the Mortgage lacked value when it was satisfied, as a matter of law, simply because of the unavailability of the Note.

Second, the Debtors, in their trial brief, also contend that "the [M]ortgage does not provide for any schedule of payments or interest." The Court presumes that the Debtors argue, by implication, that the Mortgage was accordingly unenforceable for that reason as well absent the availability of the Note. Unfortunately for the Debtors, the Mortgage indicates that (a) it secures the repayment of the $120,000 Debt, which "debt is evidenced by Borrower's note [(i.e., the Note)]," (b) the Note "provides for monthly payments, with the full debt, if not paid earlier, due and payable on May 1, 2009," and (c) it "secures to Lender [(i.e., the Debtors)] ... the repayment of the debt evidenced by the Note, with interest." Because the Mortgage so indicates, it does, in fact, provide for a schedule of payments—i.e., monthly payments with a maturity date of May 1, 2009—and the payment of interest. As for the amount of interest that would have been due on the $120,000 Debt in accordance with the Mortgage, the law in Pennsylvania is that "reference in any document to an obligation to pay a sum of money 'with interest' without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum," 41 P.S. § 202 (Purdon's 2003); see also In re Presque Isle Apartments, L.P., 118 B.R. 332, 335 (Bankr.W.D.Pa. 1990) (citing 41 P.S. § 202); therefore, interest would have been calculated on the $120,000 Debt at an annual rate of six percent, which interest would have been

due for the period from July 17, 1998, until the $120,000 Debt was paid off. Since the Mortgage thus provides for the repayment of a debt with $120,000 principal, to be paid off on a monthly basis, with interest at an annual rate of six percent, and a maturity date of May 1, 2009, the determination of the amount of the monthly payment that was to have been made in order to retire the $120,000 Debt is a matter of simple mathematics. Therefore, the Debtors are mistaken to the extent that they argue, as a predicate for their position that the availability of the Note was essential to the Mortgage's enforceability, that the terms of repayment with respect to the $120,000 Debt are undeterminable absent reference to the Note.

Finally, because the purpose behind the insistence upon the production of a document upon which one sues is so as to establish the existence of such document, even if it were the law that an action on a mortgage necessitates the production of an accompanying bond or note, such production could be dispensed with if an exception to the "best evidence rule" applied so as to allow for alternative proof of the existence of such bond or note. With respect to proof of the existence of the Note in the instant matter, several exceptions to the "best evidence rule"—i.e., the rule set forth in either Fed.R.Evid. 1002 or Pa. R.Evid. 1002—exist, at least one of which, the Court concludes, both would have applied on October 31, 2000, and would apply now such that the Note's existence could then have been, and can now be, proven other than by production of the Note or a copy thereof. See Fed.R.Evid. 1004, 28 U.S.C.A. (West 2001) (¶ 1—original lost or destroyed, ¶ 2—original not obtainable by judicial process or procedure, or ¶ 3—original in possession of opponent); Pa.R.Evid. 1004, 42 Pa.C.S.A. (Purdon's 1999) (same); Pa.R.Evid. 1004, 1998 cmt. (citing Fed.

R.Evid. 1004 advisory committee's note for the proposition that, "[u]nder F[ed].R.E[vid]. 1004, when production of the original is not required, the proffering party *need not offer a duplicate even if that is available;* the proffering party may present any evidence including oral testimony").[11] In light of the foregoing, and because the Trustee has preponderantly proven, as set forth above, that the Mortgage was valid and that the $120,000 Debt was legitimate, and since the Mortgage expressly provides that the $120,000 Debt is evidenced by the Note, the Court concludes that (a) the Trustee has thereby contradicted and impeached Mr. Dolata's testimony that the Note never existed, (b) the Trustee is, therefore, not bound by such testimony of Mr. Dolata, (c) the Trustee has thereby preponderantly proven, as well, that the Note existed with terms as described in the Mortgage, (d) the Note need not have been available for production when the Mortgage was satisfied in order to (i) establish that the Note then existed, and (ii) then support an action on the Mortgage, and (e) the Note need not now be produced in order to support a present action upon the Mortgage after the avoidance of its satisfaction.

### (iii) *Summary regarding the Mortgage's worth when it was satisfied.*

■■■ Because the Debtors and the Nondebtor Defendants have failed to preponderantly prove either that the Mortgage was a sham or that the $120,000 Debt was fake, and since the inability to produce the Note was and is immaterial to an action on the Mortgage, the Trustee, in turn, has preponderantly proven, by virtue of her

production at trial of a certified copy of the Mortgage, that the Mortgage was worth approximately $120,000 plus accompanying interest at the time of its satisfaction. The Court holds as it does, and notwithstanding the testimony of Mr. Dolata and the Son to the effect that the Son made several instalment payments subsequent to July 17, 1998, with respect to the Mortgage, because (a) Mr. Dolata and the Son also testified that the amount of such payments was minimal relative to a principal indebtedness of $120,000, which latter testimony means that, even if the Nondebtor Defendants are credited with having made several instalment payments toward the Mortgage, the outstanding principal balance due under the Mortgage—i.e., with respect to the $120,000 Debt—would still approximate $120,000, (b) "[a] recital of indebtedness in the [M]ortgage raises a presumption that the indebtedness remains unpaid," 8 P.L.E.2d *Commercial Transactions* § 230, (c) the burden to prove that payment has been made on the Mortgage thus falls on the Debtors and the Nondebtor Defendants, see *Id.,* and (d) such testimony of Mr. Dolata and the Son, without more, arguably does not even suffice to carry their burden of proof that the Son made several minimal payments toward the Mortgage.

Since the Debtors and the Nondebtor Defendants conceded at trial that the Mortgage was satisfied by the Debtors for nothing in the way of return value from the Nondebtor Defendants, and because the Trustee has preponderantly proven that the Mortgage was worth approximately $120,000 plus accompanying interest at the time of its satisfaction, the Trustee, in

---

11. Pa.R.Civ.P. 1019(i) also would not operate to defeat an action on the Note in the event that the same could not be attached to a pleading in an action in a Pennsylvania court because, "if the writing or copy [upon which

a claim is based] is not accessible to the pleader [and thus cannot be attached to a pleading], it is sufficient so to state, together with the reason, and to set forth the substance in writing." Pa.R.Civ.P. 1019(i), 42 Pa.C.S.A.

turn, has—provided that she can satisfy one of the "insolvency tests" set forth in § 548(a)(1)(B)(ii)—preponderantly proven that the satisfaction of the Mortgage constitutes a constructive fraudulent conveyance under § 548(a)(1)(B).

### (iv) *Insolvency analysis as of October 31, 2000.*

■ As set forth above, the Trustee has preponderantly proven that the satisfaction of the Mortgage constitutes a constructive fraudulent conveyance under § 548(a)(1)(B) provided that the Trustee can also satisfy one of the "insolvency tests" set forth in § 548(a)(1)(B)(ii). The Trustee contends that the "insolvency test" set forth in § 548(a)(1)(B)(ii)(I) is satisfied because, argues the Trustee, the Debtors were either insolvent on October 31, 2000, which date is when the Mortgage was satisfied, or the Debtors were rendered insolvent by such transfer. The Trustee argues, as well, that the "insolvency test" set forth in § 548(a)(1)(B)(ii)(III) is satisfied because, argues the Trustee, the Debtors either intended to incur or believed that they would incur debts that, going forward from October 31, 2000, would be beyond their ability to satisfy as such debts matured. For the reasons set forth below, the Court concludes that the Trustee has satisfied both of the "insolvency tests" set forth in § 548(a)(1)(B)(ii)(I) & (III).

As an initial matter, the state of being "insolvent" for bankruptcy purposes means, with respect to an individual debtor, "financial condition such that the sum of such ... [individual's] debts is greater than all of such ... [individual's] property, at a fair valuation, exclusive of ... property that may be exempted from property of the estate under section 522 of ... [the Bankruptcy Code]." 11 U.S.C.A. § 101(32)(A) (West 1993). The Court con-cludes that the Debtors, if they were not already insolvent on October 31, 2000, were rendered insolvent by the satisfaction of the Mortgage on such date. The Court so concludes, and without even needing to subtract from the Debtors' net asset position on October 31, 2000, those assets that the Debtors now intend to exempt under 11 U.S.C. § 522, because

(a) the Debtors, as of March 13, 2001, had net debt—i.e., liabilities less assets—equal to $211,794.87, which net debt figure includes $64,375.19 in tax debts which the Debtors contend were incurred in January and March 2001,

(b) the Debtors, as of March 13, 2001, thus had net debt equal to $147,419.68 exclusive of such tax debts,

(c) the remaining liabilities of the Debtors as of March 13, 2001, that factor into the $147,419.68 net debt figure arose prior to, or during, October 2000,

(d) the record evidence preponderantly, if not overwhelmingly, establishes that the outstanding balances on such remaining liabilities as of October 31, 2000, were at least as great, if not greater, than such outstanding balances as of March 13, 2001,

(e) the value of the Orchard Drive Property, which property's value was not taken into account when arriving at the $147,419.68 net debt figure, properly should be excluded from such figure, and even in the event that such realty constituted an asset of the Debtors prior to their disposition of the same, given that the Debtors also conveyed away the Orchard Drive Property on October 31, 2000,

(f) the record evidence—among which is the Debtors' response to item 10

in their initial and amended Statement of Financial Affairs, which response indicates that the Debtors did not engage in any extraordinary transfers of property involving significant value within one year of March 13, 2001, other than (i) the cashing in of the Certificates of Deposit, which transaction produced the $42,500 that Mr. Dolata alleges he then gambled away, and (ii) the Debtors' conveyance of the Orchard Drive Property—preponderantly, if not overwhelmingly, establishes that the value of the Debtors' assets as of October 31, 2000, was no greater than such value as of March 13, 2001, with the possible exception of the amount of cash that the Debtors might have had on October 31, 2000, if Mr. Dolata either (i) did not gamble away the $42,500 in cash that he alleges he so gambled away, or (ii) waited until after October 31, 2000, to gamble away such cash, and

(g) the record evidence thus preponderantly, if not overwhelmingly, establishes that the Debtors, after the transfers in question on October 31, 2000, were insolvent by at least $104,919.68 (i.e., $147,419.68—$42,500), if not by $147,419.68.

Therefore, the "insolvency test" set forth in § 548(a)(1)(B)(ii)(I) is satisfied.

Because the Debtors were rendered insolvent by at least $104,919.68 after the transfers of property that they effected on October 31, 2000, the Court is constrained to conclude, as well, that the Debtors thus also either intended to, or believed that they would, incur debts that, going forward from October 31, 2000, would be beyond their ability to satisfy as such debts matured. Such decision, which the Court finds may rest solely on such insolvency of the Debtors, is amplified by (a) the Debtors' incurrence of the $64,375.19 in tax debts subsequent to October 31, 2000, and (b) Mr. Dolata's alleged gambling away of the $42,500. With respect to the $64,375.19 in tax debts, the Court finds that such debt, because it was allegedly incurred in early 2001, must relate to tax liability for years prior to the tax year of 2001, which finding compels, in turn, a finding that, as of October 31, 2000, the Debtors would have expected that they would incur such tax indebtedness. Of course, because of the Debtors' insolvent position going forward from October 31, 2000, the Debtors must have believed that they would not be able to satisfy in full such tax indebtedness when it became due. As for Mr. Dolata's alleged gambling away of the $42,500, if such allegation is taken as true, then, because, as the Court understands it, Mr. Dolata effectuated such gambling no later than shortly after October 31, 2000, Mr. Dolata also then intended to effectuate such gambling, which intention, of course, means that Mr. Dolata thereby then also intended to exacerbate the Debtors' insolvent position going forward from October 31, 2000. Of course, if Mr. Dolata intended to so exacerbate the Debtors' insolvent position going forward from October 31, 2000, then, given such insolvent position, Mr. Dolata must have also then believed that the Debtors would not be able to satisfy all of their future debts as the same ultimately became due. In light of the foregoing, the "insolvency test" set forth in § 548(a)(1)(B)(ii)(III) is satisfied.

(v) *Summary of analysis under § 548(a)(1)(B) respecting the satisfaction of the Mortgage.*

Because the Trustee has preponderantly proven that the Mortgage was worth approximately $120,000 plus accompanying interest when it was satisfied, and since the Debtors and the Nondebtor Defen-

dants conceded at trial that the Nondebtor Defendants gave nothing in the way of return value for such satisfaction, and given that the Trustee has satisfied at least one of the "insolvency tests" set forth in § 548(a)(1)(B)(ii), the Trustee has thus preponderantly proven that the satisfaction of the Mortgage constitutes a constructive fraudulent conveyance that may and, thus, shall be avoided under § 548(a)(1)(B). Since the Trustee can avoid such satisfaction as a constructive fraudulent conveyance under § 548(a)(1)(B), the Court need not, and thus will not, explore whether (a) the Debtors possessed actual fraudulent intent when effecting such satisfaction, and (b) such transfer is also avoidable, as the Trustee argues, on the basis of such fraudulent intent pursuant to § 548(a)(1)(A).

### (vi) *The Trustee's recovery under § 550(a)(1).*

■ Because the satisfaction of the Mortgage is avoided as a fraudulent transfer under § 548, the Trustee is entitled to a recovery for the benefit of the Debtors' bankruptcy estate pursuant to § 550(a)(1). Such recovery for the Trustee may be had from the Nondebtor Defendants since (a) the Debtors, by satisfying the Mortgage, thereby transferred back to the Nondebtor Defendants the Mortgage, that is the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage, (b) the Nondebtor Defendants were thus the initial transferees of the Mortgage, so conveyed by way of such satisfaction, and (c) the Nondebtor Defendants were also "the entity for whose benefit" the satisfaction of the Mortgage was effected. The Court concludes that the appropriate recovery for the Trustee under § 550(a)(1) is that which restores the situation to its status quo as of October 31, 2000, that is a return by the Nondebtor Defendants to the Debtors' bankruptcy estate of the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage. The Court so concludes because such status quo, in the Court's view, represents the truest value of that which was transferred to the Nondebtor Defendants by way of the Mortgage's satisfaction.

■ As for whether the Nondebtor Defendants may, pursuant to § 550(e)(1), offset against the recovery just detailed any increase in value that the realty that was, and that will once again be, encumbered by the Mortgage has experienced due to improvements that have been made thereon by the Nondebtor Defendants (or, if less, the cost of such improvements), the Court concludes that they may not. The Court so concludes, and without ascertaining whether the Nondebtor Defendants— and, in particular, whether the Son—were good faith transferees, because (a) such offset is only allowable with respect to an increase in value that is attributable to "any improvement [that is] made *after* the [date of the] transfer" that is avoided, 11 U.S.C.A. § 550(e)(1)(A) (emphasis added), and (b) the improvements to the realty that was, and that will once again be, encumbered by the Mortgage—i.e., the 25 Acres and the Personal Residence—were all made, as the Court understands it, before rather than after October 31, 2000, which date is the date of the transfers that have been avoided.

On the strength of the foregoing, the Nondebtor Defendants and, to the extent that their assistance is necessary, the Debtors are directed to take whatever action is necessary to effect a return to the

Debtors' bankruptcy estate of the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage. Such action could take the form of, for instance, (a) an expunging of the Satisfaction Piece, if possible, from the records of the Allegheny County Recorder of Deeds, or (b) the execution and recording of a new mortgage on terms that are precisely identical to those that are contained in the Mortgage if expunging of the Satisfaction Piece is not possible. If such necessary action is not promptly undertaken and accomplished, that is within thirty (30) days from the date that the instant opinion and accompanying order are entered of record, then the Court will, upon notice from the Trustee with respect to such failure, grant her additional relief, such as, for instance, the entry of a money judgment or other appropriate order in favor of the Trustee and against the Nondebtor Defendants in such form as the Trustee may reasonably require to reinstate the status quo as of October 31, 2000, respecting the Mortgage.

**B.** ***The transfer of the Corrective Deed Property on January 11, 2001.***

█ The Trustee contends that the transfer of the Corrective Deed Property on January 11, 2001, is a constructively fraudulent transfer and avoidable as such pursuant to § 548(a)(1)(B). The Trustee argues as much because she asserts, in turn, that (a) the Debtors received nothing, that is thus much less than a reasonably equivalent value, in return for the conveyance of such property, and (b) the Debtors either (i) were insolvent on January 11, 2001, or (ii) intended to incur or believed that they would incur, going forward from January 11, 2001, debts that would be beyond their ability to satisfy as

such debts matured. If the Trustee is correct that the transfer of the Corrective Deed Property on January 11, 2001, is a constructively fraudulent transfer and avoidable as such pursuant to § 548(a)(1)(B), then, and of course, the Court need not, and thus will not, explore whether (a) the Debtors possessed actual fraudulent intent when conveying such property, and (b) such transfer is also avoidable on the basis of such fraudulent intent pursuant to § 548(a)(1)(A).

The Court understands the Debtors and the Nondebtor Defendants to offer little in response to the Trustee's constructive fraudulent conveyance cause of action regarding the transfer of the Corrective Deed Property other than meager assertions that (a) such transfer was really just a correction of a prior deed description error rather than a true transfer, and (b) the Debtors lacked actual fraudulent intent when taking action with respect to such property on January 11, 2001. Each of the foregoing defenses can be disposed of relatively quickly.

First, the prior deed description error that the Debtors testified was corrected by the January 11, 2001 execution of the Corrective Deed is contained, maintain the Debtors, in the Personal Residence Deed, which latter deed was executed by the Debtors on July 17, 1998, so that they could convey to the Nondebtor Defendants realty which now constitutes the Nondebtor Defendants' personal residence—i.e., the Personal Residence. The substance of such description error, argue the Debtors, is the failure of the Personal Residence Deed's description of the Personal Residence to encompass realty that, prior to January 11, 2001, had constituted a small portion of the Debtors' personal residence, upon which small portion of realty the Nondebtor Defendants had, at some point prior to January 11, 2001, accidentally en-

croached when they were constructing upon the Personal Residence. The preceding contentions of the Debtors notwithstanding, however, the Debtors also conceded at trial that (a) the portion of their personal residence which was so encroached upon—i.e., the Corrective Deed Property—did not constitute realty that they either had intended to convey, or had thus conveyed, to the Nondebtor Defendants in 1998 via the Personal Residence Deed, (b) their purpose in executing the Corrective Deed in 2001 was to thereby convey to the Nondebtor Defendants the Corrective Deed Property, and (c) they needed to so convey the Corrective Deed Property in 2001 because, prior to that time, they had never conveyed such realty to the Nondebtor Defendants. In light of the foregoing concessions by the Debtors, the Court cannot possibly find (a) that the description of the Personal Residence in the Personal Residence Deed was ever incorrect by virtue of such description's failure to encompass the Corrective Deed Property, or (b) consequently that the Corrective Deed was executed so as to correct a prior deed description error. Instead, given such concessions by the Debtors, the Court must find that the Corrective Deed was executed on January 11, 2001, so as to convey, in the truest sense of the word, realty—i.e., the Corrective Deed Property—to the Nondebtor Defendants, which realty, prior to such date, had never been owned by the Nondebtor Defendants.

■■■ Second, and as set forth in various parts of the instant opinion, that a debtor lacks actual fraudulent intent, as a matter of law, does not constitute a successful defense to an otherwise viable constructive fraudulent conveyance claim. Therefore, that the Debtors perhaps lacked actual fraudulent intent when executing the Corrective Deed on January 11, 2001, is legally irrelevant vis-a-vis, and thus does not

constitute a successful defense to, the Trustee's constructive fraudulent conveyance claim regarding the transfer of the Corrective Deed Property.

Briefly completing the analysis with respect to the Trustee's constructive fraudulent conveyance claim regarding the transfer of the Corrective Deed Property, the Trustee has preponderantly, if not overwhelmingly, proven that (a) the Debtors received less than a reasonably equivalent value in return for such transfer given the concession at trial of both the Debtors and the Nondebtor Defendants that the Nondebtor Defendants failed to provide any consideration of value in return for such transfer, and (b) the Debtors were insolvent on January 11, 2001, given that the Trustee has, as set forth in an earlier portion of the instant opinion, preponderantly demonstrated that the Debtors were rendered insolvent some two and one-half ($2\frac{1}{2}$) months earlier by the transfers that they effected on October 31, 2000. In light of the foregoing, the Trustee has preponderantly proven that the transfer of the Corrective Deed Property constitutes a constructive fraudulent conveyance that may and, thus, shall be avoided under § 548(a)(1)(B). Since the Trustee can avoid such property transfer as a constructive fraudulent conveyance under § 548(a)(1)(B), the Court need not, and thus will not, explore whether (a) the Debtors possessed actual fraudulent intent when effecting such property transfer, and (b) such property transfer is also avoidable on the basis of such fraudulent intent pursuant to § 548(a)(1)(A).

■■■ With respect to the Trustee's recovery pursuant to § 550(a)(1), such recovery can be obtained from the Nondebtor Defendants since they were obviously the initial transferees of the Corrective Deed Property. The Court concludes that the appropriate recovery for the Trustee un-

der § 550(a)(1) is the value of the Corrective Deed Property, which value has yet to be determined. The Court so concludes because, in order to effect a recovery of the Corrective Deed Property itself, such property, which now constitutes but a small portion of the Personal Residence, would have to be physically partitioned from such latter property, which partitioning the Court suspects would be very difficult, if not impossible. As for whether the Nondebtor Defendants may, pursuant to § 550(e)(1), offset against the recovery just detailed any increase in value that the Corrective Deed Property has experienced due to improvements that have been made thereon by the Nondebtor Defendants (or, if less, the cost of such improvements), the Court concludes that they may not. The Court so concludes because (a) such offset, as set forth above, is only allowable with respect to an increase in value that is attributable to improvements that were made *after* the date of the transfer that is avoided, and (b) the improvements to the Corrective Deed Property were all made, as the Court understands it, before rather than after January 11, 2001—i.e., the date of the avoided transfer—despite the fact that the Nondebtor Defendants did not legally acquire the Corrective Deed Property until such date. The Court will look to the Trustee for her recommendation as to how best to arrive at a determination of the value of the Corrective Deed Property, which value, as set forth above, constitutes the recovery for the Trustee that the Court orders pursuant to § 550(a)(1).

### C. *The transfer of the Orchard Drive Property on October 31, 2000.*

The Trustee contends that the transfer of the Orchard Drive Property on October 31, 2000, is a constructively fraudulent transfer and avoidable as such pursuant to § 548(a)(1)(B). The Trustee argues as much because she asserts, in turn, that

(a) the Debtors—actually Mr. Dolata—received but $1.00, that is thus much less than a reasonably equivalent value, in return for the conveyance of such property, which property was valued at $58,000 just two months earlier when Mr. Dolata took legal title to the same by way of the execution of the General Warranty Deed, and (b) the Debtors either (i) were insolvent on October 31, 2000, or (ii) intended to incur or believed that they would incur, going forward from October 31, 2000, debts that would be beyond their ability to satisfy as such debts matured. The Trustee also contends that Mr. Dolata possessed actual fraudulent intent when so conveying the Orchard Drive Property on October 31, 2000, and that such transfer is thus avoidable pursuant to § 548(a)(1)(A).

The sole response by the Debtors and the Nondebtor Defendants to this particular fraudulent conveyance cause of action appears to be that Mr. Dolata gave up nothing of value on October 31, 2000, when he executed the Orchard Drive Property Deed, which assertion, if true, would serve to defeat both the constructive and actual fraud grounds for such cause of action. Mr. Dolata and the Son argue that Mr. Dolata gave up nothing of value when he executed the Orchard Drive Property Deed because they argue, in turn, that (a) the Son rather than Mr. Dolata supplied all of the consideration in return for the August 25, 2000 acquisition of the Orchard Drive Property notwithstanding that the General Warranty Deed recites that Mr. Dolata is the only grantee of, and supplied himself the consideration for, such property, and (b) Mr. Dolata, as of October 31, 2000, was thus then only possessed of bare legal title to the Orchard Drive Property, with the equitable interest in such property thus then residing with the Son. Mr. Dolata and the Son will succeed in their argument that Mr. Dolata gave up nothing

by executing the Orchard Drive Property Deed if they are also correct in their assertion that the Son furnished all of the $58,000 in the August 25, 2000 transaction regarding the Orchard Drive Property because, if the Son furnished the entirety of such consideration, then Mr. Dolata indeed would have possessed nothing but worthless bare legal title to such property on October 31, 2000. *See* 38 P.L.E. *Trusts* § 77 (West 1961) ("Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid"); 38 P.L.E. *Trusts* § 84 (West 1961) ("Where a child's money is used to purchase property and title is taken in the name of a parent, the presumption of a resulting trust arises"). However, can Mr. Dolata and the Son succeed in arguing that the Son furnished such $58,000 in consideration on August 25, 2000? The Court, for the reasons set forth below, concludes that Mr. Dolata and the Son can so succeed.

 As an initial matter, Mr. Dolata, for the reasons set forth below, is presumed to have supplied all of the $58,000 in consideration for the acquisition of the Orchard Drive Property on August 25, 2000. Consequently, the Trustee, simply by producing a certified copy of the General Warranty Deed at trial, has presumptively proven that the Orchard Drive Property was worth $58,000 to the Debtors on October 31, 2000. In light of the foregoing presumption, the Debtors and the Son bear the burden of proving, by clear and convincing evidence, that the Son rather than Mr. Dolata actually supplied such $58,000. The Court so holds because

 (a) "a recital [in a deed] is presumptive evidence of the truth of the facts it recites," Alvin L. Arnold, *Deeds: Eleven Rules of Construction*, 22 July Real Est. L. Rep. 7, 8 (1992)

(referencing *Modern Law of Deeds to Real Property* by Robert G. Natelson); *see also* 21 P.L.E.2d *Deeds* § 53 (Bender 2003) ("When possession accompanies a deed, recitals therein are prima facie evidence of the facts recited therein, even against strangers"); *supra* p. 128 (in Pennsylvania, a consideration recital in a deed constitutes prima facie evidence of a valuable consideration); 32A C.J.S. *Evidence* § 1045 (West 2003) ("recitals in a deed are generally prima facie evidence of the facts stated or shown thereby"); *accord Henderson*, 694 S.W.2d at 34; *Sims*, 195 S.W.2d at 159; *Thrasher v. Arida*, 858 So.2d 1173, 1175 (Fla.Dist. Ct.App.2003); *Howell*, 210 So.2d at 256; *Frederick*, 147 N.W.2d at 483; *Anderson*, 32 Cal.Rptr. at 924; *Cheney's Adm'r*, 38 S.W.2d at 200; *Forbes v. Volk*, 358 P.2d 942, 945 (Wyo.1961),

 (b) "this presumption of correctness w[ill] prevail unless the party who alleges that ... [such deed recital] does not express the truth overcomes that presumption and shows the contrary by satisfactory evidence which is clear, strong and convincing," *Howell*, 210 So.2d at 256; *see also Henderson*, 694 S.W.2d at 34 (same); *Sims*, 195 S.W.2d at 159 (same); *Bachman*, 1981 WL 1934 at *3 (same); *Frederick*, 147 N.W.2d at 483 (same); *Anderson*, 32 Cal.Rptr. at 924 (same); *Cheney's Adm'r*, 38 S.W.2d at 200 (same); *Forbes*, 358 P.2d at 945 (same); *supra* p. 128 and note 8 (burden and standard of proof are the same in Pennsylvania as elsewhere regarding attacks upon deed recitals),

 (c) the General Warranty Deed recites that Mr. Dolata supplied all of the $58,000 in consideration for the Or-

chard Drive Property on August 25, 2000,

(d) state law supplies the rule of decision, within the context of a fraudulent conveyance action under either the Bankruptcy Code or state law, regarding who supplied consideration for a grant of real property that is conveyed via an executed deed,

(e) the rule regarding the effect of the presumption that attaches to a deed recital, as set forth in paragraph (b) above, controls in the instant matter rather than the rule set forth in Fed.R.Evid. 301 that a presumption does not shift to the party against whom a presumption is directed the burden of proof in the sense of the risk of nonpersuasion since (i) state law, as set forth in paragraph (d) above, supplies the rule of decision regarding that portion of the Trustee's claim vis-a-vis who paid for the Orchard Drive Property on August 25, 2000, and (ii) "the effect of a presumption respecting a fact which is an element of a claim or defense as to which [s]tate law supplies the rule of decision is determined in ac-

cordance with [s]tate law," Fed. R.Evid. 302, 28 U.S.C.A., and

(f) the Debtors and the Son, as a consequence of the state law regarding deed recitals and the presumptions that attach thereto, when combined with Fed.R.Evid. 302, are saddled with the burden of proving that the Son rather than Mr. Dolata actually supplied such $58,000 on August 25, 2000.[12]

The Court also holds as it does despite the recital in the Orchard Drive Property Deed that Mr. Dolata, prior to the execution of such deed, "was the only record title holder [of the Orchard Drive Property] as a straw party" because, although such deed recital raises itself a presumption that Mr. Dolata never owned the beneficial interest in such realty (i.e., that he did not furnish the $58,000 in consideration for the acquisition of the same), the Court concludes that, at least within the context of the instant adversary proceeding, such presumption is not entitled to anywhere near as much weight as is, and thus is overcome by, the presumption that attaches to the conflicting deed recital in the General Warranty Deed that Mr. Dolata furnished the $58,000 on August 25, 2000.

12. That the Debtors and the Son, in the instant matter, bear the burden of proving, by clear and convincing evidence, that the Son rather than Mr. Dolata actually supplied the $58,000 on August 25, 2000, is consistent with the law in Pennsylvania (a) that, "in the case of a resulting trust arising from payment of the purchase money by one person for the transfer of title to another, the burden of proof is on the party claiming such trust to prove that the property was purchased with his money," 38 P.L.E. *Trusts* § 85 (West 1961), and (b) that "[t]he evidence to support a resulting trust must be so *clear,* precise, *and convincing* and satisfactory that it will satisfy the mind and conscience of the court," *Id.* (emphasis added). Such consistency, in turn, is not at all surprising given that (a) "[t]he rationale for requiring clear and convincing

evidence in order initially to open the question of beneficial ownership [within the context of a resulting trust contest] is that *there should be a strong presumption in favor of one whose title is indicated without qualification in a written instrument,"* Restatement (Third) of Trusts § 9 (reporter's notes on cmt. f(1)) (2003) (emphasis added), and (b) the presumption that attaches to the General Warranty Deed recital that Mr. Dolata owned and paid for the unqualified title—i.e., both legal title and equitable interest—to the Orchard Drive Property accounts, in the instant matter, for the imposition upon the Debtors and the Son of the burden of proving, by clear and convincing evidence, that the Son actually owned the beneficial interest in such realty from the point in time when the General Warranty Deed was executed.

The Court so assesses the weight to be accorded the two conflicting presumptions that are referred to in the preceding sentence because the Orchard Drive Property Deed was executed on October 31, 2000, or only two weeks after the $176,000 Verdict was returned against each of the Debtors, which fact, for purposes of a subsequent fraudulent conveyance action, thus serves to severely denigrate—i.e., color as self-serving—a recital contained therein to the effect that Mr. Dolata never paid for, and thus never owned, the beneficial interest in the Orchard Drive Property.[13]

Having held that the Debtors and the Son bear the burden of proving, by clear and convincing evidence, that the Son rather than Mr. Dolata actually supplied all of the $58,000 in consideration for the acquisition of the Orchard Drive Property on August 25, 2000, the Court proceeds to hold that the Debtors and the Son have barely, but nevertheless successfully, carried such burden. The Court so holds

(a) on the strength of the testimony of Mr. Dolata and the Son. With respect to such testimony, the Court is swayed not so much by the general testimony that the Son rather than Mr. Dolata actually supplied all of the $58,000 in consideration—such

testimony, as set forth above, is nothing but self-serving. Instead, the Court finds to be particularly credible, and is thus persuaded by, the testimony to the effect that Mr. Dolata originally took title to the Orchard Drive Property even though the Son provided all of the consideration for its acquisition so as to shield, that is to protect, the Son from the Daughter-in-law vis-a-vis the Orchard Drive Property in the event that those two eventually divorced. This particular testimony is consistent with the credible testimony of the Debtors and the Son that the Mortgage was utilized as a vehicle to provide similar protection to the Son with respect to the realty encumbered by the Mortgage in the event that he eventually divorced from the Daughter-in-law. Much as the Court finds that Mr. Dolata subjectively intended to, and then did, effectuate a plan to provide the Son with the aforesaid protection via a binding and enforceable mortgage, the Court finds that Mr. Dolata and the Son similarly intended to, and then did, effectuate a plan to provide the Son with similar protection re-

---

**13.** As set forth above, the Court attaches much weight to the fact that the Orchard Drive Property Deed was executed only two weeks after the $176,000 Verdict was returned against each of the Debtors. The Court concludes that such fact serves (a) to overwhelmingly impeach, and thus render nonbinding, the testimony of Mr. Dolata that he conveyed the Orchard Drive Property to the Son on October 31, 2000, only because the Son and the Daughter-in-law's relationship had by that time improved, and (b) likewise to severely denigrate a recital contained in the Orchard Drive Property Deed to the effect that Mr. Dolata never paid for, and thus never owned, the beneficial interest in the Orchard Drive Property. Put differently, the Court finds that the timing of the $176,000

Verdict is what prompted Mr. Dolata to (a) execute the Orchard Drive Property Deed when he did, and (b) insert into such deed the aforesaid recital. That the Son may have requested, at some point prior to October 31, 2000, that Mr. Dolata transfer such property to the Son does not affect the Court's thinking on the matter, and even if such request occurred only days prior to October 31, 2000, because the evidence produced at trial establishes overwhelmingly that Mr. Dolata, within the roughly two-week period subsequent to the returning of the $176,000 Verdict (i.e., the two-week period that ended on October 31, 2000), sought to obstruct or impede any collection efforts that might ensue as a result of such verdict. *See, e.g., infra* pp. 146 – 148.

specting the Orchard Drive Property, which plan took the form of Mr. Dolata taking title to such realty even though the Son supplied all of the consideration for the acquisition of the same;

(b) because of the independent testimony of the Son's bookkeeper to the effect that the Son (i) paid all expenses, including real property taxes, with respect to the Orchard Drive Property, and (ii) did not remit any portion of the revenues that he regularly received from the rental of the Orchard Drive Property to Mr. Dolata. If Mr. Dolata actually paid all, or any part, of the purchase price for such realty, the Court would expect that Mr. Dolata would have, in turn, then paid some pro rata portion of the expenses and received some pro rata portion of the remuneration associated with such realty. With respect to the rental revenues associated with the Orchard Drive Property, the Court cannot find that any of the checks from the Son to Mr. Dolata that the Trustee produced as her Trial Exhibit 24 pertained to such rental income because such checks are all dated prior to August 25, 2000, which date is when the Orchard Drive Property was first acquired by the Dolata family; and

(c) because of the utter dearth of documentary evidence provided by the Trustee in support of her allegation that Mr. Dolata provided anywhere from $10,000 to $40,000 of the purchase money for the Orchard Drive Property. Although the Trustee was able to establish that Mr. Dolata had at his disposal $40,000 shortly prior to August 25, 2000, the Trustee failed, and notwithstanding discovery on the issue, to produce any documentation that would remotely establish that all or some part of such $40,000 was utilized to purchase the Orchard Drive Property—such dearth of documentation is telling because the Court would fully expect that discovery would have produced at least some minimal amount of relevant documentation.

Because the Son rather than Mr. Dolata actually supplied all of the $58,000 in consideration for the acquisition of the Orchard Drive Property on August 25, 2000, the Son owned the equitable interest in, and Mr. Dolata merely owned worthless bare legal title to, such property on October 31, 2000. Consequently, Mr. Dolata gave up nothing of value by executing the Orchard Drive Property Deed on October 31, 2000, which finding necessarily means, in turn, that he (a) did not receive less than a reasonably equivalent value in return for his transfer of bare legal title to the Orchard Drive Property, (b) consequently did not thereby engage in a constructive fraudulent conveyance that could be avoided under either 11 U.S.C. § 548(a)(1)(B) or 12 Pa.C.S.A. § 5104(a)(2), (c) lacked any actual fraudulent intent when executing such deed, and (d) consequently did not, by virtue of actual intent, thereby engage in a fraudulent conveyance that could be avoided under either 11 U.S.C. § 548(a)(1)(A) or 12 Pa.C.S.A. § 5104(a)(1).

**D. *The conveyance sometime after October 25, 2000, of the $42,500 that emanated from the closeout of the Certificates of Deposit.***

 The Trustee asserts that the transfer sometime after October 25, 2000, of the $42,500 in cash that was produced by Mr. Dolata's closeout of the Certificates of Deposit (hereafter "the $42,500") is avoidable both as a constructively fraudu-

lent transfer pursuant to § 548(a)(1)(B) and on the basis of actual fraudulent intent pursuant to § 548(a)(1)(A). The Trustee argues that the transfer of the $42,500 is avoidable under § 548(a)(1)(B) as a constructive fraudulent transfer because she asserts, in turn, that (a) the Debtors received nothing, that is thus much less than a reasonably equivalent value, in return for the conveyance of such property, and (b) the Debtors either (i) became insolvent as a result of the transfer of such property, if they were not already insolvent by October 25, 2000, or (ii) intended to incur or believed that they would incur, going forward from October 25, 2000, debts that would be beyond their ability to satisfy as such debts matured. The Trustee also maintains that Mr. Dolata transferred the $42,500 with actual intent to hinder, delay, or defraud his creditors, and that such transfer is, accordingly, avoidable on the basis of such malevolent intent pursuant to § 548(a)(1)(A).

Because Mr. Dolata testified that he gambled away the $42,500, and since the Trustee failed, and frankly had a lack of incentive, to contradict or impeach such testimony, and given that the Trustee called Mr. Dolata as a witness, the Trustee is consequently bound by such testimony and the Court, therefore, shall find that Mr. Dolata so conveyed away the $42,500. As a consequence of the preceding finding that the $42,500 was transferred, the same potentially may be avoided as fraudulent pursuant to § 548(a)(1). Mr. Dolata offered at trial as the Debtors' apparent sole defense to the Trustee's fraudulent conveyance claim regarding the $42,500 that he so gambled with a purpose in mind to win enough money so that the Debtors would then be able to pay all of their creditors who were then in existence—in other words, that Mr. Dolata gambled away the $42,500 but without an intent to hinder, delay, or defraud his creditors.

■ The Court holds that the transfer of the $42,500 by way of Mr. Dolata's gambling cannot be avoided as a constructive fraudulent conveyance under § 548(a)(1)(B). The Court so holds not, of course, because of Mr. Dolata's alleged lack of malevolent intent but, instead, because (a) a debtor who gambles, as a matter of law, generally receives reasonably equivalent value in the form of his or her right to receive payment in the event that such gambling is successful, *see In re Chomakos*, 69 F.3d 769, 770–772 (6th Cir. 1995) (holding that the time to determine whether a debtor receives reasonably equivalent value for a wager "is not the time when the bet is won or lost, but the time when the bet is placed" because, even though such wager "may turn out badly, [ ] unless and until it does, the contractual right to receive payment in the event that it turns out well is obviously worth something;" noting also that gamblers receive value in the form of " 'psychic and other intangible values[ ]' just as patrons of a fine restaurant do," and that a restaurateur's purchases cannot be attacked as constructively fraudulent transfers), and (b) Mr. Dolata, on behalf of himself and Mrs. Dolata, thus received reasonably equivalent value in return for such gambling.

■ Nevertheless, the Court finds, for reasons that are set forth in another section of the instant opinion, that Mr. Dolata gambled away the $42,500 with an intent to hinder, delay, and/or defraud his creditors. Despite such finding, however, the Court must hold that the Trustee cannot, in any event, ultimately prevail on her fraudulent conveyance claim vis-a-vis the $42,500, and even though the gambling away of such funds would be avoidable as fraudulent pursuant to § 548(a)(1)(A). The Court so holds because, even if it were

to so avoid as fraudulent the transfer of the $42,500, the Trustee cannot, within the context of a fraudulent conveyance action, recover such funds pursuant to § 550(a) from any of the defendants that are named in the instant adversary proceeding. The rationale for the preceding holding is simple. First, the $42,500 was transferred neither to nor for the benefit of the Nondebtor Defendants. Therefore, the Nondebtor Defendants could not have been a transferee of the $42,500 from whom the same could be recovered under § 550(a). Second, a debtor, as a matter of law, cannot constitute a transferee of such debtor's own transfer within the meaning of § 550(a), not even one for whose benefit such transfer was made. *See In re Coggin*, 30 F.3d 1443, 1453–1454 (11th Cir. 1994). Consequently, the Trustee cannot recover the $42,500 from the Debtors pursuant to § 550(a) even if she were to successfully avoid as fraudulent the transfer of such funds under § 548(a)(1)(A). Because the Trustee has not named as a defendant in the instant adversary proceeding the gambling establishment where Mr. Dolata gambled away the $42,500, the Trustee is left without a named defendant from whom she may recover such funds within the confines of her fraudulent conveyance claim vis-a-vis such funds. Since the Trustee thus cannot prevail on such fraudulent conveyance claim, the Court sees no reason at this point to develop its finding that Mr. Dolata fraudulently gambled away the $42,500. However, such finding, because it constitutes a basis in part for the Court's denial of the Debtors' Chapter 7 discharges, shall be discussed at greater length below in the Court's consideration of the Trustee's objection to such discharges.

## II. *Request for Injunctive Relief.*

In her Count 3 the Trustee seeks to have enjoined the further transfer of any of the assets that she seeks to recover by way of her fraudulent conveyance causes of action. As an initial matter, the Trustee, of course, could only possibly be entitled to such injunctive relief with respect to assets that are the subject of those fraudulent conveyance causes of action for which the Trustee has prevailed herein, to wit (a) the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage, and (b) the Corrective Deed Property. Therefore, and for instance, the Trustee could not obtain an order from the Court that enjoins the Nondebtor Defendants from transferring in the future the remaining portion, that is the bulk, of property interests in either the 25 Acres or the Personal Residence; instead, the universe of potential injunctive relief to which the Trustee might be entitled vis-a-vis such parcels of realty is limited to the particular mortgage (i.e., security) interests in such parcels of realty that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage.

With respect to the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage, the Court ascertains that an injunction need not be granted that will prevent the Nondebtor Defendants from transferring away or otherwise compromising such property interests in the future. The Court so concludes, in part, because the Court, at this time, hereby impresses upon the 25 Acres and the Personal Residence a constructive trust in favor of the Trustee for the benefit of the Debtors' bankruptcy estate to the

extent of such mortgage (i.e., security) interests in such parcels of realty; in other words, such mortgage (i.e., security) interests in such parcels of realty shall be held in constructive trust by the Nondebtor Defendants for the Trustee. The imposition of such constructive trust by the Court is appropriate at this time (a) because constructive trusts are imposed to remedy, and arise out of circumstances evidencing, fraud, *see, e.g.,* 38 P.L.E. *Trusts* §§ 102 & 104; *Voest–Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 216–217 (3rd Cir.1990); *In re Aultman,* 223 B.R. 481, 483 (Bankr.W.D.Pa.1998); *Foxcroft,* 184 B.R. at 674; *In re Leitner,* 236 B.R. 420, 424 (Bankr.D.Kan.1999), (b) given that the Nondebtor Defendants, as set forth above, reacquired, by way of a fraudulent conveyance in the form of the Debtors' satisfaction of the Mortgage, the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage, and (c) pursuant to both 11 U.S.C. § 105(a) and an exercise of this Court's inherent powers, *see In re Air Florida, Inc.,* 44 B.R. 798, 805 (Bankr.S.D.Fla.1984); *Zygulski v. Daugherty,* 236 B.R. 646, 651–653 (N.D.Ind.1999); *Kaiser Aerospace and Electronics Corp. v. Teledyne Industries, Inc.,* 229 B.R. 860, 871 (S.D.Fla.1999), *aff'd in part, rev'd in part on other grounds,* 244 F.3d 1289 (11th Cir.2001). Because the Court grants to the Trustee the remedy of a constructive trust as just detailed, and since the Trustee is free to file and have indexed a *lis pendens* where appropriate to place others on notice going forward as to the existence of such constructive trust, and given that the combination of such constructive trust and *lis pendens* will operate to prevent the Nondebtor Defendants, either inside or outside of any bankruptcy case that they themselves might commence, from transferring away or otherwise compromising in the future such mortgage (i.e., security) interests in the 25 Acres and the Personal Residence, *see Aultman,* 223 B.R. at 485–487; *Leitner,* 236 B.R. at 424–426, the Court sees absolutely no reason to, and thus shall not, grant the injunctive relief that the Trustee seeks with respect to such mortgage (i.e., security) interests in the 25 Acres and the Personal Residence.

■ As for injunctive relief regarding the Corrective Deed Property, the Court denies injunctive relief that would serve to preclude the Nondebtor Defendants from transferring in the future title to the Corrective Deed Property because the recovery under § 550(a)(1) that the Court granted to the Trustee as a result of the Debtors' fraudulent conveyance of the same was not a recovery of such realty but rather its value.

### III. *Objections to Discharge.*

In the Trustee's Count 4 the Trustee objects to the Chapter 7 discharge of both of the Debtors pursuant to 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(5). The basis for certain of the discharge objections by the Trustee is undoubtedly the Debtors' failure to comply with repeated discovery requests of the Trustee prior to March 15, 2002, which date is when the Trustee filed her adversary complaint. Because the Debtors subsequently complied with such discovery requests, albeit belatedly and only after direction by the Court, the Court presumes that those discharge objections predicated upon the Debtors' discovery noncompliance have disappeared. However, the Trustee's discharge objections lodged under § 727(a)(2) and (a)(4)(A) clearly remain viable, and the Court, for the reasons set forth below, sustains the lion's share of such objections,

thereby effectively denying the Chapter 7 discharge of both of the Debtors.

The Trustee, as the objecting plaintiff, bears the burden of proving her objections to the Debtors' Chapter 7 discharge. *See* Fed.R.Bankr.P. 4005, 11 U.S.C.A. (West 2003); 6 *Collier on Bankruptcy* ¶ 727.14[7] at 727–71 (Bender 2003). The standard of proof for any objection to discharge is a preponderance of the evidence. *See In re Sheets,* 269 B.R. 339, 340 (Bankr.M.D.Pa.2001) (citing *In re Adams,* 31 F.3d 389 (6th Cir.1994); *Farouki v. Emirates Bank International, Ltd.,* 14 F.3d 244 (4th Cir.1994); *In re Beaubouef,* 966 F.2d 174 (5th Cir.1992); *In re Serafini,* 938 F.2d 1156 (10th Cir.1991), and noting that cases which opt for clear and convincing evidence standard were all decided prior to the U.S. Supreme Court's decision in *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); 6 *Collier on Bankruptcy* ¶ 727.14[7] at 727–72 (citing *In re Scott,* 172 F.3d 959 (7th Cir.1999), in addition to the circuit court cases cited in *Sheets,* and observing that "since the Supreme Court's decision in *Grogan v. Garner* ..., courts have adopted the position that the burden of proof under section 727(a) is proof by a preponderance of the evidence") & ¶ 727.02[3][e] at 727–21 (same).

## A. § 727(a)(2).

The Trustee objects to the Debtors' Chapter 7 discharge under § 727(a)(2), in particular, on the basis that, either within one year of the March 13, 2001 commencement of the instant bankruptcy case or subsequent thereto, both of the Debtors, with actual intent to hinder, delay, or defraud either their creditors or the Trustee, transferred, destroyed, or concealed, or permitted to be transferred, destroyed, or concealed, (a) the Mortgage, (b) the Corrective Deed Property, (c) the Orchard Drive Property, and (d) the Certificates of Deposit, as well as the $42,500 that emanated from the closeout of the same.

11 U.S.C. § 727(a)(2) provides that a Chapter 7 discharge may be denied if

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

11 U.S.C.A. § 727(a)(2) (West 1993). The requisite "intent to hinder, delay, or defraud" under § 727(a)(2) "must be an actual intent as distinguished from constructive intent.... [However,] a careful reading [of § 727(a)(2)] indicates that intent to hinder or delay creditors, even if not fraudulent, may be sufficient for a denial of discharge." 6 *Collier on Bankruptcy* ¶ 727.02[3][a] at 727–17 to 727–18. With respect to proof of fraudulent intent,

[a]lthough actual intent must be shown, a finding of actual intent may be based on circumstantial evidence or on inferences drawn from a course of conduct. This is because a debtor is unlikely to testify that the intent was fraudulent. Thus a court may look to all the surrounding facts and circumstances. A continuing pattern of wrongful behavior is one indication of fraudulent intent.

*Id.* at ¶ 727.02[3][b] at 727–18.

The Court concludes, by much more than a preponderance of the evidence, that Mr. Dolata, within one year of the March 13, 2001 commencement of the

instant bankruptcy case, fraudulently transferred the $42,500 that emanated from the closeout of the Certificates of Deposit. The Court so concludes, in part, because (a) Mr. Dolata did not even withdraw such $42,500 from the Debtors' joint checking account until October 25, 2000, which means that such funds necessarily could not have then been transferred away by Mr. Dolata until some time thereafter, and (b) October 25, 2000, is itself well within one year of March 13, 2001. Mr. Dolata, the Court presumes, disputes that he transferred away such $42,500 with fraudulent intent. The Court presumes, as well, that Mr. Dolata, in support of his position, contends that the Trustee, since she called Mr. Dolata as her witness at trial, is bound by Mr. Dolata's testimony that he gambled away such money with but one purpose in mind, which purpose was to win enough money so that the Debtors would then be able to pay all of their creditors who were then in existence. However, and as set forth above, a party is only bound by the testimony of its own witness if such testimony both (a) is not contradicted or impeached by other evidence, and (b) is not inherently improbable. *See supra* p. 124. Unfortunately for Mr. Dolata, his testimony that he altruistically rather than fraudulently gambled away the $42,500 both is impeached by other evidence and is inherently improbable. Such testimony is impeached by the evidence that establishes that (a) Mr. Dolata vigorously disagreed with the $176,000 Verdict that was returned against himself and Mrs. Dolata, (b) Mr. Dolata only gambled away the $42,500 after the $176,000 Verdict was so returned on October 16, 2000, (c) Mr. Dolata cashed in each of the three Certificates of Deposit prior to the dates upon which they were set to mature, and (d) Mr. Dolata cashed in the Certificates of Deposit and then drained the Debtors' joint checking account, into which

was deposited the proceeds from the Certificates of Deposit, all within a span of just nine days after October 16, 2000 (i.e., October 16, 2000, to October 25, 2000). Such testimony is also inherently improbable, and not only because of the evidence set forth in the preceding sentence but due to (a) the implausibility, the Court finds, of an individual debtor gambling with the sole purpose of attempting to ease or rectify his or her debt woes, and (b) the manner in which Mr. Dolata gambled away the $42,500, that is by gambling away such money in one fell swoop without telling anybody, including Mrs. Dolata, of such action on his part.

In light of the foregoing, the Court concludes that Mr. Dolata transferred away the $42,500 with fraudulent intent; such conclusion, in turn, dictates that the Court sustain the Trustee's discharge objection as to Mr. Dolata under § 727(a)(2), thereby effectively denying his Chapter 7 discharge. Because the Court sustains such discharge objection as to Mr. Dolata on the strength of his transfer of such $42,500, the Court need not explore further whether Mr. Dolata fraudulently engaged in the other conveyances that are advanced by the Trustee as cause for a denial of Mr. Dolata's discharge under § 727(a)(2).

 As for the Trustee's discharge objection under § 727(a)(2) as to Mrs. Dolata, the Court chooses to overrule such discharge objection because (a) Mrs. Dolata testified, and the Court will accept although it is at least somewhat skeptical, that, prior to their transfers, she knew nothing about the Mortgage, the Orchard Drive Property, or the Certificates of Deposit and the $42,500 that emanated from the closeout of the same, thereby making it impossible for her to have transferred away such property, much less with fraudulent intent, (b) Mrs. Dolata, although she

knew about and participated in the transfer of the Corrective Deed Property, lacked, the Court finds, the requisite intent to thereby hinder, delay, or defraud anybody, which finding the Court makes largely because of the relative *de minimis* nature of such conveyance, and (c) the Court, as set forth below, denies Mrs. Dolata's discharge pursuant to § 727(a)(4)(A), which action thus makes needless a further examination into whether her discharge should also be denied under § 727(a)(2).

### B. § 727(a)(4)(A).

The thrust of the Trustee's objection to the Debtors' Chapter 7 discharge under § 727(a)(4)(A) is, in particular, that both of the Debtors uttered false oaths by virtue of their answers to questions 8, 10, and 11 in both their initial and their amended Statements of Financial Affairs, coupled with their declarations, under the penalty of perjury, that they "ha[d] read the answers contained in the foregoing statement[s] of financial affairs . . . and that . . . [such answers we]re true and correct to the best of . . . [their] knowledge, information, and belief."

11 U.S.C. § 727(a)(4)(A) provides that a Chapter 7 discharge may be denied if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C.A. § 727(a)(4)(A) (West 1993).

In order to prevail, the TRUSTEE must establish that:

1) The debtor made a statement under oath;

2) The statement was false;

3) The debtor knew the statement was false;

4) The debtor made the statement with the intent to deceive; and

5) The statement related materially to the bankruptcy case.

A false oath may include a knowing and fraudulent omission. *In re Wilson,* 290 B.R. 333, 337 (Bankr.C.D.Ill. 2002) (citations omitted). "[T]he term 'oath' in Bankruptcy Code section 727(a)(4)(A) necessarily includes the unsworn declarations prescribed in the Official Forms," *In re Leija,* 270 B.R. 497, 502–503 (Bankr.E.D.Cal.2001); *In re Bren,* 303 B.R. 610, 613–614 (8th Cir. BAP 2004), which means, as well, that "[a] material omission from a debtor's sworn statement of [financial] affairs or [bankruptcy] schedules presents grounds for denying a discharge under 11 U.S.C. § 727(a)(4)(A)," *In re Ingle,* 70 B.R. 979, 983 (Bankr.E.D.N.C. 1987). *See also Wilson,* 290 B.R. at 337 (same); *In re Rosenzweig,* 237 B.R. 453, 458 (Bankr.N.D.Ill.1999) (same); *In re Dreyer,* 127 B.R. 587, 597–598 (Bankr. N.D.Tex.1991) (same); 6 *Collier on Bankruptcy* ¶¶ 727.04[1][c] & 727.04[2] at 727–41 to 727–42 (same).

"[T]he test for materiality of the subject matter of a false oath is whether it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Wilson,* 290 B.R. at 337; *see also In re Mascolo,* 505 F.2d 274, 277 (1st Cir.1974) (same); *In re Tully,* 818 F.2d 106, 110–111 & n. 4 (1st Cir.1987) (same). Therefore, the unsworn declarations prescribed in the Official Forms are themselves material. *See Leija,* 270 B.R. at 503; *Bren,* 303 B.R. at 615. As well, "if the omission interferes with the possibility of a preference or fraudulent conveyance action the omission may be considered material." 6 *Collier on Bankruptcy* ¶ 727.04[1][b] at 727–41; *see also Mascolo,* 505 F.2d at 277–278 (same).

"The requirement that a false statement be knowingly and fraudulently

made is satisfied for purposes of 11 U.S.C. § 727(a)(4)[(A)] if the 'debtor knows the truth and nonetheless wilfully and intentionally swears to what is false.'" *Ingle,* 70 B.R. at 984; *see also Tully,* 818 F.2d at 112 ("the statute necessitates no more than 'an intentional untruth in a matter material to an issue which is itself material' to justify withholding a discharge"). As well, "'reckless indifference to the truth . . . is the equivalent of fraud.'" *In re Dubrowsky,* 244 B.R. 560, 576 (E.D.N.Y.2000); *see also Wilson,* 290 B.R. at 339 (requisite degree of fraudulent intent shown if debtor "engaged in behavior which displayed a reckless and cavalier disregard for the truth"); *In re Hatton,* 204 B.R. 477, 484 (E.D.Va.1997) ("'reckless indifference to the truth' constitutes the 'functional equivalent of fraud'"); *In re Mazzola,* 4 B.R. 179, 182–184 (Bankr.D.Mass.1980) ("A reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge"); *Leija,* 270 B.R. at 501 (same); *Ingle,* 70 B.R. at 983 (same); *In re Nazarian,* 18 B.R. 143, 147 (Bankr.D.Md.1982) (same); *Tully,* 818 F.2d at 112 (same); *Bren,* 303 B.R. at 614 & 616 (same); 6 *Collier on Bankruptcy* ¶ 727.04[1][a] at 727–40 (same). "[F]raudulent intent may be established by circumstantial evidence, or by inference drawn from a course of conduct. . . . Thus a 'pattern of concealment and nondisclosure' would permit an inference of the requisite intent." *Hatton,* 204 B.R. at 484; *see also Nazarian,* 18 B.R. at 146–147 ("Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case"); *Wilson,* 290 B.R. at 339 (same); *Ingle,* 70 B.R. at 983 (same); *Dubrowsky,* 244 B.R. at 572–573 (same, holding also, in particular, that "fraudulent in-

tent may be inferred from a series of incorrect statements contained in the schedules"); *Bren,* 303 B.R. at 614 (same); 6 *Collier on Bankruptcy* ¶ 727.04[1][a] at 727–40 (same). "Although subsequent voluntary disclosure through testimony or an amendment to the schedules cannot expunge the falsity of an oath, subsequent disclosures are evidence of innocent intent." *Wilson,* 290 B.R. at 339; *see also Ingle,* 70 B.R. at 984 ("The fact that the property in question is included in the debtor's amended petition does not excuse its original omission"). Such subsequent disclosures, however, shall not evidence innocent intent if "[n]o [adequate] explanation has been offered as to why these items were left off the original petition." *Ingle,* 70 B.R. at 984.

 With respect to information that is falsely disclosed in, or that is omitted from, a debtor's bankruptcy schedules or Statement of Financial Affairs, debtors, in response to a § 727(a)(4)(A) discharge objection predicated upon the same, sometimes argue that they lacked the intent to thereby deceive (i.e., the fourth element of a § 727(a)(4)(A) objection as set forth above) because, they argue in turn, they (a) never bothered to read such documents after their preparation, and (b) thus could not possibly have been aware of, and therefore necessarily lacked the intent to deceive with respect to, such false disclosure or omission. Unfortunately for such debtors, and as a matter of law, if such debtors concede that they have failed to read such documents, then they have uttered at least one, if not perhaps two, separate false oaths with fraudulent intent that are actionable under § 727(a)(4)(A). First, if a debtor fails to read his or her bankruptcy schedules or Statement of Financial Affairs but nevertheless signs the declaration that is included at the end of such documents to the effect that he or she

has read such document, then such debtor has, at a minimum, fraudulently uttered a false oath for purposes of § 727(a)(4)(A) in the form of such declaration, *see Leija,* 270 B.R. at 502–503; *Dreyer,* 127 B.R. at 597; indeed, because such declaration under such circumstance constitutes a fraudulently-uttered false oath, it would matter not if such debtor (a) did not, in fact, play any role in the publication of the false disclosure or omission itself, and (b) could thus perhaps argue that he or she did not even thereby make a false oath (i.e., the first element of a § 727(a)(4)(A) objection set forth above), let alone one with fraudulent intent, *see Mazzola,* 4 B.R. at 180–184 (finding that wife debtor fraudulently uttered false oaths even though, at least according to such debtor, she did not participate in the preparation of her bankruptcy petition, schedules, and Statement of Financial Affairs). Second, if a debtor plays any role in the publication of the false disclosure or omission itself, such as by providing or failing to provide relevant information to the preparer of his or her bankruptcy schedules or Statement of Financial Affairs, then such debtor has made a false oath in the form of such false disclosure or omission, which oath is also deemed to be fraudulently uttered by virtue of such debtor's failure to read such documents because, by not so reading, the debtor exhibits a reckless indifference to the truth, which recklessness, as set forth above, is the equivalent of fraud. *See Wilson,* 290 B.R. at 340; *Bren,* 303 B.R. at 614–616; *cf. Hatton,* 204 B.R. at 485 (quoting *In re Sims,* 148 B.R. 553, 557 (Bankr.E.D.Ark.1992), for the proposition that merely glancing over a bankruptcy petition and schedules evidences reckless indifference for the truth); *Mazzola,* 4 B.R. at 183–184 (attributing false disclosures and omissions to wife debtor as false oaths even though, at least according to such debtor, she did not participate in the

preparation of her bankruptcy petition, schedules, and Statement of Financial Affairs, and then holding that her failure to read such documents when she had intimate knowledge of the true facts constituted reckless indifference to the truth).

 Debtors, in response to a § 727(a)(4)(A) discharge objection predicated upon a disclosure in, or an omission from, bankruptcy schedules or a Statement of Financial Affairs, also frequently defend by contending that they lacked the intent to thereby deceive on the ground that they only made such disclosure or omitted to disclose on the advice of their counsel. Unfortunately for such debtors, and as a matter of law, such a defense is availing only if, *inter alia,* advice of counsel was needed by such debtors in order for them to be able to ascertain what they needed to do, that is whether they needed to disclose and, if so, in what fashion; if such advice was so unnecessary, then a knowingly false disclosure or knowingly baseless omission to disclose constitutes a false, as well as a fraudulently uttered, oath. *See Leija,* 270 B.R. at 503; *Ingle,* 70 B.R. at 984; *Tully,* 818 F.2d at 111; *Hatton,* 204 B.R. at 484; *Nazarian,* 18 B.R. at 147; *Mascolo,* 505 F.2d at 277 n. 4; *In re Boutiette,* 168 B.R. 474, 479 (Bankr.D.Mass.1994); *Dubrowsky,* 244 B.R. at 573–575. The Court also holds itself, although at least certain of the immediately preceding case authorities likely stand as well for the proposition, that a debtor, with respect to information that such debtor would know that he or she should disclose in bankruptcy schedules and/or the Statement of Financial Affairs even absent advice from his or her counsel, cannot successfully defend against a § 727(a)(4)(A) discharge objection predicated upon a failure to disclose such information—and, in particular, cannot successfully defend with respect to the deceptive

intent element of such objection—by asserting that (a) he or she blindly relied on his or her counsel's prompting before he or she would so disclose such information, and (b) such counsel simply failed, for whatever reason, to so prompt him or her. The Court so holds (a) as a corollary of the preceding statement of the law regarding advice of counsel because, if a debtor cannot shield himself or herself from a § 727(a)(4)(A) discharge objection by relying upon advice of counsel when such advice is unnecessary, then such debtor certainly cannot so shield himself or herself by blindly relying on an unnecessary prompt from such counsel, and (b) in light of the declarations that are made under penalty of perjury and included at the end of both the bankruptcy schedules and the Statement of Financial Affairs because, even if a debtor blindly relies on such prompt from his or her counsel, such debtor nevertheless also so swears in part, by virtue of such declarations, that the information contained in such documents is true and correct to the best of his or her knowledge, information, and belief, which declarations such debtor would know, regardless of the lack of such prompting, are false.

■■■ Applying the foregoing law to the instant matter, the Court concludes, by much more than a preponderance of the evidence, that Mr. Dolata made at least eleven knowingly false statements under oath with the intent to deceive that are material to the instant bankruptcy case, namely:

(1) Mr. Dolata's response to question 8 in the Debtors' initial Statement of Financial Affairs, where, by checking the box marked "NONE," he thereby (a) represented that he had not lost any money from gambling within one year prior to the commencement of the instant bankrupt-

cy case, which representation was false given that, as Mr. Dolata testified, he gambled away the $42,500 that emanated from the closeout of the Certificates of Deposit, which gambling necessarily occurred within only four and one-half months of the commencement of such case, and (b) omitted from his answer to such question 8 such gambling loss;

(2) Mr. Dolata's unchanged response to such question 8 in the Debtors' first amended Statement of Financial Affairs dated May 10, 2001—the failure to change such response amounts to a second representation that he had not, as well as a second omission of the fact that he had, incurred a gambling loss within one year prior to the commencement of the instant bankruptcy case;

(3) Mr. Dolata's unchanged response to such question 8 in the Debtors' second amended Statement of Financial Affairs dated August 14, 2002—the failure to change such response amounts to a third representation that he had not, as well as a third omission of the fact that he had, incurred a gambling loss within one year prior to the commencement of the instant bankruptcy case;

(4) Mr. Dolata's response to question 10 in the Debtors' initial Statement of Financial Affairs, where, by checking the box marked "NONE," he thereby (a) represented that he had not made any extraordinary—i.e., out of the ordinary course—transfers of the Debtors' property within one year prior to the commencement of the instant bankruptcy case, which representation was false if for no other reason than that Mr. Dolata, as set forth in paragraph (1) above, transferred away the $42,500

via gambling, and (b) omitted from his answer to such question 10 such extraordinary transfer;

(5) Mr. Dolata's failure to amend his response to such question 10 in the Debtors' first amended Statement of Financial Affairs dated May 10, 2001, so as to reveal the aforesaid $42,500 extraordinary transfer, which failure to amend amounts to a second (a) representation that he had not made such transfer, and (b) omission of such transfer from his answer to such question;

(6) Mr. Dolata's failure to amend his response to such question 10 in the Debtors' second amended Statement of Financial Affairs dated August 14, 2002, so as to reveal the aforesaid $42,500 extraordinary transfer, which failure to amend amounts to a third (a) representation that he had not made such transfer, and (b) omission of such transfer from his answer to such question;

(7) Mr. Dolata's response to question 11 in the Debtors' initial Statement of Financial Affairs, where, by checking the box marked "NONE," he thereby (a) represented that he had not closed out, *inter alia,* any certificates of deposit within one year prior to the commencement of the instant bankruptcy case, which representation was false given that, as Mr. Dolata testified, he closed out the three Certificates of Deposit worth approximately $50,000 sometime in October 2000, which time period is roughly only five months prior to the commencement of such case, and (b) omitted from his answer to such question 11 the closing out of the Certificates of Deposit;

(8) Mr. Dolata's failure to amend his response to such question 11 in the

Debtors' first amended Statement of Financial Affairs dated May 10, 2001, so as to reveal such closing out of the Certificates of Deposit, which failure to amend amounts to a second (a) representation that he had not closed out the Certificates of Deposit, and (b) omission of such closing out from his answer to such question; and

(9–11) The declarations signed under penalty of perjury by Mr. Dolata at the end of the Debtors' initial, first amended, and second amended Statement of Financial Affairs to the effect that not only had he read the answers contained in such documents but that such answers were true and correct to the best of his knowledge, information, and belief, which declarations were false because, as the Court finds for the reasons set forth below, Mr. Dolata knew when he made such declarations that his answers to questions 8, 10, and 11 to each such Statement of Financial Affairs were false, excepting for his answer to question 11 in the Debtors' second amended Statement of Financial Affairs dated August 14, 2002.

The rationale for the Court's conclusion follows:

(a) Each of the eleven foregoing false representations and omissions constitute false statements which, because they are contained within the Debtors' Statement of Financial Affairs, also constitute false oaths for purposes of § 727(a)(4)(A);

(b) Mr. Dolata knew that each of the eleven foregoing false oaths were false when he made them. The Court cannot find any other way

with respect to the first eight of the oaths listed above since, when Mr. Dolata answered questions 8, 10, and 11 to the Debtors' Statement of Financial Affairs, the events for which such questions elicited information from Mr. Dolata had already happened. Moreover, such events, as it turns out, had happened relatively recently in comparison to, that is within four to five months of, the Debtors' answers to their initial Statement of Financial Affairs, which means that the Court cannot find that Mr. Dolata simply forgot such events when formulating his answers to such questions. Because the Court finds that Mr. Dolata knew, when he answered such questions to the Debtors' Statement of Financial Affairs, that he was answering them falsely, the Court necessarily finds as well that he knew, when he made the declarations under penalty of perjury that such answers were true and correct to the best of his knowledge, information, and belief, that such declarations were also false;

(c) Each of the eleven foregoing knowingly false oaths relate materially to the instant bankruptcy case because they concern, and thus bear on the discovery of, the existence and disposition of certain of the assets of the Debtors. Furthermore, and although not entirely dispositive regarding the materiality of such false oaths, the dollar amount of the assets that are the subject of such false oaths, or $42,500 to approximately $50,000, is unquestionably material to the administration of the instant bankruptcy case; and

(d) Mr. Dolata made each of the eleven foregoing knowingly false oaths with an intent to deceive. The Court must find that Mr. Dolata possessed such fraudulent intent because, when he made each such oath, he then knew that each such oath was false, yet he wilfully and intentionally swore, under penalty of perjury, that each such oath was nevertheless true. The Court cannot find, in the face of eleven false oaths made over time, that Mr. Dolata was simply careless or negligent—instead, if each of the eleven false oaths are to be attributed to oversights on Mr. Dolata's part, then such oversights, because they number no less than eleven, are each, the Court finds, a result not of carelessness or negligence but rather reckless indifference to the truth by Mr. Dolata, which recklessness is equivalent to the requisite fraudulent intent under § 727(a)(4)(A). That Mr. and Mrs. Dolata ultimately revealed the closure of the Certificates of Deposit in their second amended Statement of Financial Affairs neither serves to innoculate, nor evidences that Mr. Dolata innocently uttered, the two prior false oaths to the effect that the Debtors had not closed out any certificates of deposit within one year of the Debtors' bankruptcy petition filing, particularly given that (i) Mr. Dolata, at trial, provided no explanation, let alone an adequate explanation, for such two prior false oaths, and (ii) such revelation by the Debtors of the closure of the Certificates of Deposit was practically compelled rather than voluntary, which finding is dictated by the fact that the Debtors did not reveal such closure via such second amendment until after they were directed by a July 25, 2002 order of this Court to produce documents that they knew

would reveal such closure. As well, a defense by Mr. Dolata that he failed to read the answers to questions 8, 10, and 11 to the Debtors' initial and two amended Statements of Financial Affairs would be unavailing since such failure to read would, by itself, establish that (i) the signed declarations made by Mr. Dolata at the end of each Statement of Financial Affairs were false, fraudulently uttered, and therefore actionable as false oaths under § 727(a)(4)(A), and (ii) Mr. Dolata exhibited a reckless indifference to the truth, which recklessness is equivalent to fraud. Finally, also unavailing would be any defense by Mr. Dolata that he relied on his counsel's advice in falsely answering, or that he relied on the failure of such counsel to prompt him to disclose information to such counsel so that an answer could be formulated to, questions 8, 10, and 11 to the Debtors' initial and two amended Statements of Financial Affairs—the Court so concludes (i) because, given that questions 8, 10, and 11 to a Statement of Financial Affairs are written such that they are easily understandable by an individual debtor, and since Mr. Dolata could not possibly have had any reason to be puzzled as to how he needed to respond to such questions, any advice or prompting by Mr. Dolata's counsel would have been unnecessary, thereby foreclosing the availability of such a defense, and (ii) in light of those parts of the sworn declarations that Mr. Dolata made at the end of the Debtors' initial and two amended Statement of Financial Affairs to the effect that such documents were true and correct to the best of Mr. Dolata's knowledge, information, and belief, which portions of such declarations Mr. Dolata must have known were not true, and regardless of such counsel's advice or lack of prompting.

■ As for Mrs. Dolata, the Court understands her to contend that, even though she signed sworn declarations as well to the effect that the answers to questions 8, 10, and 11 to the Debtors' initial and two amended Statements of Financial Affairs were true and correct to the best of her knowledge, information, and belief, she nevertheless was genuinely unaware of the falsity of, and thus could not have possessed the intent to deceive with respect to, such answers, thereby insulating her from a charge that she fraudulently uttered false oaths by virtue of such answers. Although the Court is skeptical as to the veracity of such assertion by Mrs. Dolata, the Court will accept, for the sake of argument, that she was, with one important exception, unaware of the falsity of such answers, with the exception being her and Mr. Dolata's answer to question 10 in their second amended Statement of Financial Affairs dated August 14, 2002. The reason for, and the significance of, the Court's finding that Mrs. Dolata knew of the falsity regarding such answer is set forth below.

As an initial matter, Mrs. Dolata joined with Mr. Dolata in amending their Statement of Financial Affairs—and, in particular, question 11 thereto—on August 14, 2002, to reveal the closing out of the three Certificates of Deposit. By virtue of her signed, sworn declaration at the bottom of such amendment, Mrs. Dolata declared not only that such amended question 11 was true and correct to the best of her knowledge, information, and belief but also that the answers to the rest of the questions in the Debtors' initial and first amended

Statements of Financial Affairs remained so true and correct.

The Court finds that Mrs. Dolata, because she joined with Mr. Dolata in making such amendment on August 14, 2002, became aware by at least that date that (a) such Certificates of Deposit had existed, (b) Mr. Dolata had closed the same out in October 2000, (c) the same had thus been closed out within one year of the date of the Debtors' bankruptcy petition filing, and (d) Mr. Dolata, on both his behalf and hers, had obtained roughly $50,000 as a result of the closure of the Certificates of Deposit. Because she was armed with such knowledge, the Court finds that Mrs. Dolata, in turn, also ascertained, on or before August 14, 2002, that such funds had been disposed of by Mr. Dolata prior to the date of the Debtors' bankruptcy petition filing.

Of course, since the Debtors conveyed away such $50,000 within one year of the date of their bankruptcy petition filing date, they were obligated to reveal as much in their answer to question 10 in their Statement of Financial Affairs, yet an answer to such effect was never forthcoming. Because Mrs. Dolata was aware when she joined in the second amendment to the Debtors' Statement of Financial Affairs on August 14, 2002, that question 10 thereto had previously been answered incorrectly, that is that the answer to such question previously had omitted such transfer of such $50,000, her failure to amend such answer to such question amounted to (a) a representation—and a knowingly false one—by her that such transfer had not occurred, and (b) an omission by her of such transfer from the answer to such question.

Such knowingly false representation and omission constitutes a knowingly false statement which, because it is contained within the Debtors' Statement of Financial Affairs, also constitutes a knowingly false oath by Mrs. Dolata for purposes of § 727(a)(4)(A). Given that she knew that the answer to such question 10 was false when she signed, under penalty of perjury, the declaration contained at the end of the Debtors' second amended Statement of Financial Affairs to the effect that such answer, among others, was true and correct to the best of her knowledge, information, and belief, the Court necessarily must also conclude that such declaration by Mrs. Dolata is a knowingly false oath for purposes of § 727(a)(4)(A). For the same reasons that Mr. Dolata's knowingly false oaths relate materially to the instant bankruptcy case, so too do the two knowingly false oaths made by Mrs. Dolata.

Much of the analysis regarding Mr. Dolata's fraudulent intent vis-a-vis his knowingly false oaths also applies with equal validity to the issue of fraudulent intent as respects Mrs. Dolata's two knowingly false oaths. In particular, the Court must find that Mrs. Dolata uttered her false oaths with intent to deceive because, when she made each such oath, she then knew that each such oath was false, yet she wilfully and intentionally swore, under penalty of perjury, that each such oath was nevertheless true. As well, the Court finds that, because Mrs. Dolata only amended the Debtors' Statement of Financial Affairs on August 14, 2002, to reveal that the Certificates of Deposit had been closed out, she (a) consciously deliberated as to the disclosures that were necessary regarding the Certificates of Deposit, and (b) thus was not simply careless or negligent when she failed to amend the Debtors' answer to question 10 thereto so that the same would disclose the transfer of the $50,000 in proceeds that resulted from such closeout—instead, the Court finds that her failure to so amend was a product of her reckless indifference to the truth, which reckless-

ness is equivalent to the requisite fraudulent intent under § 727(a)(4)(A). Finally, unavailing would be defenses by Mrs. Dolata that she (a) failed to read and consider the answer to question 10 to the Debtors' Statement of Financial Affairs when, or shortly prior to when, she signed the declaration at the end of the second amendment to such document, (b) relied on her counsel's advice in failing to amend such question 10, and/or (c) relied on the failure of such counsel to prompt her to disclose information to such counsel so that a correct answer could be formulated to such question 10.

In light of the foregoing, the Court concludes, by the necessary preponderance of the evidence, that Mrs. Dolata made at least two knowingly false statements under oath with the intent to deceive that are material to the instant bankruptcy case.

Because Mr. and Mrs. Dolata each made several knowingly false statements under oath with the intent to deceive that are material to the instant bankruptcy case, the Court must sustain the Trustee's discharge objection under § 727(a)(4)(A) as to, and thus must deny the Chapter 7 discharge of, both Mr. and Mrs. Dolata.

## CONCLUSION

The satisfaction of the Mortgage on October 31, 2000, and the transfer of the Corrective Deed Property on January 11, 2001, can be, and thus are, avoided as constructive fraudulent conveyances pursuant to § 548(a)(1)(B). The Trustee, pursuant to § 550(a)(1), is entitled to recover from the Nondebtor Defendants (a) the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage, and (b) the value of the Corrective Deed Property.

The transfer of the 25 Acres on July 17, 1998, and the transfer of the Orchard Drive Property on October 31, 2000, may not be, and thus are not, avoided as fraudulent conveyances, be it under either (a) a constructive fraud theory or an actual fraudulent intent theory, and (b) 11 U.S.C. § 548(a)(1) or 12 Pa.C.S.A. § 5104(a). The conveyance by the Debtors sometime after October 25, 2000, of the $42,500 that emanated from the closeout of the Certificates of Deposit may be avoided as a fraudulent conveyance under an actual fraudulent intent theory pursuant to § 548(a)(1)(A); nevertheless, the Trustee may not recover, pursuant to § 550(a)(1), any of such funds from any of the named defendants in the present adversary proceeding.

The Trustee's request for injunctive relief is denied in its entirety. Nevertheless, and as part of the rationale for such denial, a constructive trust is impressed upon the 25 Acres and the Personal Residence in favor of the Trustee for the benefit of the Debtors' bankruptcy estate to the extent of the mortgage (i.e., security) interests in such parcels of realty that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage.

The Trustee's objection to the Chapter 7 discharge of Mr. Dolata is sustained pursuant to both §§ 727(a)(2) and 727(a)(4)(A). The Trustee's objection to the Chapter 7 discharge of Mrs. Dolata is sustained pursuant to § 727(a)(4)(A). Therefore, the Chapter 7 discharges of both of the Debtors are denied.

## ORDER OF COURT

**AND NOW**, this **27th day** of **February, 2004**, upon consideration of (a) the Trustee's four-count adversary complaint, wherein the Trustee (i) pursues fraudulent conveyance avoidance causes of action pur-

suant to both 11 U.S.C. § 548 (Count 1) and Pennsylvania fraudulent transfer law (Count 2), (ii) requests injunctive relief (Count 3), (iii) objects to the above-captioned debtors' Chapter 7 discharge pursuant to several paragraphs of 11 U.S.C. § 727(a) (Count 4), and (iv) names as defendants not only the instant debtors, Joseph Dolata, Jr. and Marie Dolata (hereafter "the Debtors" or "Mr. and/or Mrs. Dolata"), but also, with respect to Counts 1—3, the Debtors' son and daughter-in-law, Joseph Dolata, III and Lori Dolata (hereafter "the Nondebtor Defendants" or "the Son" and/or "the Daughter-in-law"), and (b) the various briefs, trial exhibits, and other documentary material submitted by the parties in support of their respective positions; and subsequent to notice and a trial with respect to all of the above matters held on August 25, 2003; and for the reasons, and also utilizing the nomenclature that is, set forth in the accompanying Memorandum Opinion dated February 27, 2004, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

(a) the satisfaction of the Mortgage on October 31, 2000, and the transfer of the Corrective Deed Property on January 11, 2001, are AVOIDED as constructive fraudulent conveyances pursuant to § 548(a)(1)(B);

(b) the Trustee, pursuant to § 550(a)(1), shall **RECOVER** from the Nondebtor Defendants (i) the mortgage (i.e., security) interests in the 25 Acres and the Personal Residence that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage, and (ii) the value of the Corrective Deed Property;

(c) the transfer of the 25 Acres on July 17, 1998, and the transfer of the Orchard Drive Property on October 31, 2000, are **NOT AVOIDED** as fraudulent conveyances, be it under either (i) a constructive fraud theory or an actual fraudulent intent theory, and (ii) 11 U.S.C. § 548(a)(1) or 12 Pa.C.S.A. § 5104(a);

(d) the avoidance as fraudulent of the conveyance by the Debtors sometime after October 25, 2000, of the $42,500 that emanated from the closeout of the Certificates of Deposit is **FUTILE** given that the Trustee may **NOT RECOVER**, pursuant to § 550(a)(1), any of such funds from any of the named defendants in the present adversary proceeding;

(e) the Trustee's request for injunctive relief is **DENIED IN ITS ENTIRETY**;

(f) a **CONSTRUCTIVE TRUST** is impressed upon the 25 Acres and the Personal Residence in favor of the Trustee for the benefit of the Debtors' bankruptcy estate to the extent of the mortgage (i.e., security) interests in such parcels of realty that the Nondebtor Defendants had originally conveyed to the Debtors by way of the Nondebtor Defendants' grant of the Mortgage; and

(g) the Trustee's objection to the Chapter 7 discharge of (i) Mr. Dolata is **SUSTAINED** pursuant to both §§ 727(a)(2) and 727(a)(4)(A), and (ii) Mrs. Dolata is **SUSTAINED** pursuant to § 727(a)(4)(A)—therefore, the Chapter 7 discharges of both of the Debtors are **DENIED.**